Connolly, J.

INTRODUCTION

This is an action by the Commercial Union Insurance and American Employers’ Insurance Company (collectively, “Commercial Union”) against The Gillette Company, LLC (“Gillette”). Commercial Union alleges claims against Gillette for declaratory judgment as to whether, inter alia, under the primary policies, Gillette is entitled to coverage for all of any of Gillette’s claims (Count I); declaratory judgment as to, inter alia, any of the Gillette umbrella policies with respect to all or some of the amounts it seeks to recover from Commercial Union (Count II): and declaratory judgment as to the P.R. Mallory Policy (Count III). Gillette counterclaims for declaratory relief under G.L.c. 231A seeking, inter alia, a judgment that Commercial Union is obligated to pay all costs incurred by Gillette in their obligations to pay environmental claims in several sites (Count I); that Commercial Union has breached the policies by failing to defend and indemnify Gillette (Count II); that Gillette will be irreparably harmed in that it will be deprived of the contractual benefit of Commercial Union’s duty to defend on an ongoing basis (Count III); and that Commercial Union engaged in unfair or deceptive practices under G.L.c. 93A (Count IV). The current phase of litigation is limited to the issues in relation to contamination at the Shaffer Landfill in Billerica, Massachusetts and at Gillette’s South Boston Manufacturing Center.
This litigation concerns the obligation of Commercial Union to provide insurance coverage to their long-time policyholder Gillette for the monies expended by Gillette, and to be expended in the future, in responding to its legal liability to pay for the cleanup of environmental contamination at the Shaffer Landfill and at Gillette’s South Boston Manufacturing Center.
This matter is before the court on cross motions for partial summary judgment.

BACKGROUND

South Boston Manufacturing Center

The following are the undisputed facts. Gillette is the owner of the South Boston Manufacturing Center (“SBMC”) which is located in South Boston, Massachusetts and is bounded by Fort Point Channel on the west. In or about 1962, Gillette caused to be constructed Building Z at the site in which blade manufacturing and other operations have been conducted continuously since. Blade washing operations using trichloroethylene (“TCE”) began in Building Z in approximately 1963. Gillette has asserted claims against Commercial Union for insurance coverage arising from the presence in the environment of TCE which released from the basement crawlspace area of Building Z at SBMC.[2]
Several Gillette employees testified that the source of the TCE discharges have been operational discharges to an unlined diywell during the course of still and coil cleaning operations in the TCE area, condensate blow down discharges from the Hoyt and other recovery units consisting of TCE-contaminated water flowing though pipes into an unlined clean-out pit, and the discharge into the unlined diywell and clean-out pit of TCE during the course of a tank overflow in 1974.
Gillette workers and the affidavit of Richard Dewling, an environmental engineer retained by Gillette, stated that it is likely that the releases of TCE to the environment were the result of accidental spills or leaks of TCE during tank truck deliveries, occasional spills of TCE-contaminated waters during coil cleaning operations or from waste water recovery operations, accidental breaks in pipes, hoses, pumps or seals resulting in spills of TCE or TCE-contaminated waste waters, and a large spill of TCE that occurred in 1974 during a tank truck delivery. Gillette maintains that as a result of these spills TCE likely entered the environment through a small diywell or sump in the TCE area, through seepage in the TCE area, and/or perhaps though a pipe clean-out pit, as well as into the soil outside the Z Building.
To the contrary, Franklin E. Woodward, an environmental engineer, in his expert report stated that:
on site chemical engineering practices at the Gillette plant constituted and resulted in the direct discharge of raw materials (solvents) and industrial wastes to the ground, contaminating soils and groundwater, which was, at the time not accepted practice and Gillette knew these practices would damage the environment. The placement of a dry well in a spill containment area was contrary to accepted practices for storage and handling of chlorinated solvents during the period at issue.
Beginning in 1994,[3] Gillette directly or through its environmental representatives, performed a Site Assessment at SBMC and has maintained regular communications with the Massachusetts Department of Environmental Protection (“DEP”) pursuant to which the TCE release in question has been given Release Tracking No. RTN11312 and pursuant to which Gillette has submitted to the DEP Phase I, II, III, IV and other reports under the Massachusetts Contingency Plan, 310 C.M.R. 40.000 (“MCP”).
The first notice to Commercial Union with respect to a claim or potential claim for insurance coverage with respect to the South Boston site was by letter dated June 12, 2000. As of July 1, 2002, Gillette claims it has incurred approximately $4,600,000 in costs for which it seeks insurance coverage. Of this amount, $2,516,420.40 was incurred by Gillette on or *728 before June 12, 2000.“[4] Subsequent to June 12, 2000, Gillette has continued to incur expenses for which it claims coverage in this matter. These expenses relate to the continued compliance by Gillette with the requirement of the MCP.

Shaffer Landfill

The Shaffer Landfill is located in Billerica, Massachusetts. By the early 1960s, the Shaffer Landfill was being used as a waste disposal site by numerous entities. Between 1968 and at least through 1972, Gillette began to use the Shaffer Landfill to discard trash from its South Boston Manufacturing Center. Beginning in the mid-to-late 1970s, Gillette also shipped waste to the Shaffer Landfill from other facilities, including its Andover Manufacturing Center.
The United States Environmental Protection Agency (“EPA”) investigated the Shaffer Landfill and concluded the soil and groundwater at the site is contaminated with hazardous substances. The property contamination at Shaffer Landfill started no later than 1963 and continued to occur during 1963-71, and events causing the contamination occurred during 1963-71.[5] Gillette shipped trash to the Shaffer Landfill from the South Boston Manufacturing Center (“SBMC”) between 1968 at least though 1972, and the trash contained some materials considered to be hazardous under the federal Superfund law (aerosol).[6]
In June 1993, EPA notified Gillette that it was a Potentially Responsible Party at the Shaffer Landfill.[7] Gillette joined a multi-party consent decree which required Gillette and other companies to fund an EPA-supervised remediation program for the Shaffer Landfill. Commercial Union has refused to reimburse Gillette for any of the costs that Gillette has paid as its share of the remediation work required at the site by the terms of the EPA consent decree.
In 1971, Metcalf and Eddy, environmental consultants to Gillette, stated that the disposal methods for aerosol can products, including their disposal in the Shaffer Landfill, were not considered acceptable. Robert Healy was Division Manager of Manufacturing Engineering Services at the Andover Manufacturing Facility for Gillette from 1968-76. He testified that as early as 1971, he was aware of the practice of trucking aerosol cans to landfills and crushing them throughout the period of time he was at Andover. He also testified that he was aware from sometime in 1971 that Metcalf & Eddy did not consider the crushing of aerosol cans at landfills to be an acceptable solution. He also testified that because the practice was legal at the time, that this was an acceptable disposal practice.

Insurance Agreements

Gillette purchased insurance policies from Commercial Union (including predecessors and affiliates) from at least October 1, 1963 though December 1, 1984. The parties have stipulated to the terms and limits of the primary comprehensive general liability policies that were issued for periods from October 1, 1969 through December 1, 1984 and of the umbrella policies that were issued for periods from October 1, 1963 through December 1, 1984.
With minor variations in phrasing, under the primary policies, Commercial Union is obligated, subject to certain conditions and exclusions, to “pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of Coverage A. bodily injury or Coverage B. property damage to which this insurance applies, caused by an occurrence.” Similarly, under the umbrella policies, Commercial Union agreed “to indemnify the insured for all sums which the Insured shall be obligated to pay by reason of the liability imposed on him by law or liability assumed by him under contract or agreement for damages, and expenses, all as included in the definition of ‘ultimate net loss,’ because of: (a) personal injuries, as hereinafter defined; (b) property damage, as hereinafter defined; (c) advertising liability as hereinafter defined.” The above primary policies require Commercial Union to defend Gillette in connection with a covered occurrence that causes property damage during the applicable policy period, subject to the primary and umbrella policies’ terms, conditions, limitations, and exclusions.[8]
Additionally, the policies contain several exclusions relevant to these cross motions. The first exclusion bars recovery for any damages that were intentionally or knowingly caused by Gillette. The primary policies exclude coverage for property damage that is “neither expected nor intended from the standpoint of the insured.” The umbrella policies issued during 1972-1984 contain the same language. The umbrella policies issued during October 1, 1963 to October 1, 1976 exclude coverage for “property damage caused intentionally or at the direction of the insured.” These umbrella policies also state that “this policy applies only to occurrences . . . which happen during the policy period,” and “occurrence” is defined to mean “(a) an accident, or (b) an event, or continuous repeated exposure to conditions, which unexpectedly results in . . . property damage . . . during the policy period . . .”
At all times relevant to this motion each of the primary liability policies contained an “Assistance & Cooperation Condition.” The “Assistance and Cooperation Condition” provided as follows: “[Gillette] [s]hall not, except at its own cost, voluntarily make any payment, assume any obligation or incur any expense other than for first aid to others at the time of the accident.”[9] The Umbrella Liability Policies also contained Voluntary Payment Conditions which are identical in all material respects.[10]
The umbrella policies also contain a “Loss Payable” provision which requires Gillette to make a claim for expenses under the umbrella policies within twelve months of having made certain payments. Specifically, the “Loss Payable” provision provides in relevant part:
*729 Liability under this policy with respect to any occurrence shall not attach unless and until the insured, or the insured’s underlying insurer, shall have paid the amount of the underlying limits on account of such occurrence. The insured shall make a definite claim for any loss for which the company may be liable under this policy within twelve (12) months after the insured shall have paid an amount of ultimate net loss in excess of the amount borne by the insured or after the insured’s liability shall have been fixed and rendered certain either by final judgment against the insured after actual trial or by written agreement of the insured, the claimant, and the company. If any subsequent payment shall be made by the insured on account of the same occurrence, additional claims shall be make similarly from time to time . . ,[11]

THE STANDARD FOR SUMMARY JUDGMENT

Under Mass.R.Civ.P. 56(c), summary judgment becomes appropriate if no material facts are disputed and if the moving party is entitled to judgment as a matter of law. See e.g. Highland Ins. Co. v. Aerovox, Inc., 424 Mass. 226, 232 (1997). The moving parly bears the burden of affirmatively demonstrating the absence of a triable issue and the legal entitlement to judgment in its favor. Pederson v. Time, Inc., 404 Mass. 14, 16, 17(1989). A moving party which does not bear the burden of proof at trial is entitled to summary judgment if it submits affirmative evidence, unmet by countervailing materials, that either negates an essential element of the nonmoving party’s case or demonstrates that the nonmoving party has no reasonable expectation of proving an essential element of its case. Kourouvacilis v. General Motors Corp., 410 Mass. 706, 716 (1991). The opposing party cannot rest on the pleadings or on mere assertions of disputed facts to defeat the summary judgment motion. “If the moving party establishes the absence of a triable issue, the party opposing the motion must respond and allege specific facts which would establish the existence of a genuine issue of material fact . . .” Pederson, 404 Mass, at 17. Finally, in its inspection of the summary judgment record, the court must credit facts in the light most favorable to the opposing party. Bisson v. Eck, 430 Mass. 406, 407 (1999); Gray v. Giroux, 49 Mass.App.Ct. 436, 437 (2000). Where “there is no real dispute as to the salient facts or if only a question of law is involved,” summary judgment shall be granted to the party entitled to judgment as a matter of law. Cassesso v. Commissioner of Correction, 390 Mass. 419, 422 (1983).
The purpose of a declaratory judgment action is “to provide a plaintiff relief from uncertainty and insecurity with respect to rights, duties, status and other legal relations.” Shali v. Bull HN Information Systems, Inc., 437 Mass. 696, 705 (2002). The declaratory judgment statute “was intended to expand, at least in the discretion of the court, prior provisions for interpretation of written instruments.” Billings v. Fowler, 361 Mass. 230, 234 (1972). “One of the benefits of the declaratory procedure is that it does not require one to incur the risk of violating some term of a contract or of invading some right of the other, even if done in good faith, before he may have relief.” Shali, 437 Mass, at 705, quoting Sch. Comm. of Cambridge v. Superintendent of Schs. of Cambridge, 320 Mass. 516, 518 (1946). A final decree should determine the whole controversy between the parties and should leave for “future determination no issue reasonably raised by the bill and prayers for relief.” Vesce v. Gottfried, 353 Mass. 568, 569 (1968) (citations omitted).

DISCUSSION

I. Gillette’s Partial Motion for Summary Judgment
A. Coverage at the Shaffer Landfill
Gillette seeks summary judgment against Commercial Union because the relevant primary and umbrella policies,[12] by their terms, require Commercial Union to indemnify Gillette for “all sums” which Gillette becomes “obligated to pay” as a result of “property damage” which occurred during the policy period.[13] Conversely, Commercial Union contends that, in order to prevail at summary judgment, Gillette must demonstrate the sums it has paid or become obligated to pay as damages because of damage caused by an occurrence. Specifically, Commercial Union contends that Gillette fails to make any showing that the alleged occurrences, or the alleged resulting property damage, bear any relationship to the “all sums” Gillette is legally obligated to pay. Therefore, initially, the question before this court is whether Gillette, in order to prevail at summary judgment, needs to show a causal relationship between all of the amounts it has paid and the occurrence or property damage during those policy periods which has resulted.
This issue is one of Massachusetts law. In Hazen Paper Co. v. United States Fidelity and Guarantee Co., 407 Mass. 689 (1990), the court considered whether an insurance policy, which recited that the insurer would defend and indemnify the insured against all “damages on account of . . . property damage,” provided coverage where an insured was required by government agencies to reimburse them for environmental cleanup costs. The court explained that the crucial predicate for coverage, where cleanup costs is at stake, is that some actual property damage must have taken place. See Hays v. Mobil Oil Corp., 930 F.2d 96, 102 (1991). ‘The occurrence is the injurious exposure to the hazardous material during the policy periods caused by the release of hazardous materials. Trustees of Tufts University v. Commercial Union Ins. Co., 415 Mass. 844, 848 (1993). The ’’property damage" is the continued contamination of the soil and groundwater on the site during the policy periods caused by the release of hazardous materials." Id., *730 citing Hazen Paper Co. v. United States Fidelity and Guar. Co., 407 Mass, at 698.
In support of its claim that contamination of the landfill started in the early 1960s and continued at least until October 1, 1971, Gillette directs the court to the expert testimony of Richard Riordan.[14] Additionally, Gillette, through the EPA evidentiaiy summary, demonstrates that from 1968-1972 Gillette sent trash to Shaffer Landfill from the South Boston site, and this trash contained some substances considered hazardous under CERCLA.[15] The relevant policies covered Gillette for property damage during the applicable policy periods: October 1, 1969-October 1, 1970 and October 1, 1963-October 1, 1971. This evidence is sufficient for Gillette to meet its initial burden of demonstrating that the contamination of the soil and groundwater on the site during the policy periods was caused by the release of hazardous materials. Hazen Paper Co., 407 at 698.
Commercial Union does not attempt to demonstrate a disputed issue of fact in regards to the contamination: but merely contends Gillette continued to contaminate the site in the mid-1970s through their own shipment of aerosol cans to the site, which occurred subsequent to the expiration of the relevant policies. Since Gillette polluted the site subsequent to the relevant policy periods, Commercial Union contends that Gillette cannot prevail at summary judgment unless it demonstrates that the amounts it paid to the EPA were causally connected to the contamination during the policy period. Implicit in this argument, is that Gillette, to prevail at summary judgment, would have to show which amounts the EPA required it to pay because of contamination during the relevant policy periods, and which amounts the EPA required it to pay because of subsequent contamination. Under this theory, Commercial Union would only be responsible for the portion of the costs causally related to the property damage contamination during the relevant policy periods.[16]
With environmental damage claims under property policies, as with liability policies, it is often difficult to determine when the property damage occurred. Rubenstein v. Royal Ins. Co. of Amen, 44 Mass.App.Ct. 842, 851 (1998). Here, there is evidence that contaminants have been released both during the policy period and subsequent to it. In such cases, the insurer has a duty irrespective of whether damage or contamination resulting from the release of hazardous materials was discovered or manifested during the policy period. Id., citing Trustees of Tufts Univ. v. Commercial Union Ins. Co., 415 Mass. 844.
Commercial Union’s policies contain standard language that the insurer will pay on behalf of the insured “all sums which the insured shall become obligated to pay by reason of the liability imposed on him by law or liability assumed by him under contract or agreement for damages . . . because of . . . property damage.” The Appeals Court in Massachusetts has interpreted this same language to mean that, when multiple policies are triggered to cover the same loss, each policy provides indemnity for the insured’s entire liability, and each insurer is jointly and severally liable for the entire claim. Rubenstein v. Royal Ins. Co. of Amer., 44 Mass.App.Ct. at 852, citing Keene Corp. v. Insurance Co. of N. America 667 F.2d 1034, 1047-50 (D.C.Cir. 1981), cert denied, 455 U.S. 1007; Hatco Corp. v. W.R. Grace & Co., 801 F.Sup. 1334, 1345 (D.N.J. 1992). See J.H. France Refractories Co. v. Allstate Ins. Co., 626 A.2d 502 (Pa. 1993); Lac D’Amiante du Quebec v. American Home Assurance Co., 613 F.Sup. 1549 (D.C.N.J. 1985); Goodyear Tire & Rubber Co. v. Aetna Casualty & Surety Co., 95 Ohio St.3d 512, 516 (2001).
Neither the “all sums” clause, nor any other language in the policies limits the insurer’s liability to losses attributable to property damage occurring during the policy period. No language in the policies permits proration among triggered policies. Chicago Badge & Iron Co. v. Certain Underwriters at Lloyd’s London, Civ. Act. No. 9407495, Super.Ct. (Jan. 8, 1999) (Kottmyer, J.) (under Illinois law, “all sums” clause did not limit the insurer’s responsibility to losses attributable to property damage during the policy period). Specifically, neither the definitions of ultimate net loss and occurrence nor any other language in the umbrella[17] or primary[18] policies limits the insurer’s responsibility to losses attributable to property damage during the policy period. To the contrary, the general language obligates Commercial Union to pay “all sums” which the insured becomes legally obligated to pay because of, inter alia property damage. Therefore, a requirement that Gillette demonstrate that all amounts it paid to the EPA is causally related to property damage during that policy period, essentially proration, is inconsistent with Commercial Union’s policies. Therefore, on the basis of the “all sums” language of the policies, this Court holds that Commercial Union is obligated to provide full coverage to Gillette and is therefore jointly and severally liable to the plaintiff for costs of the legal liability incurred as a result thereof. Rubenstein v. Royal Ins. Co. of America 44 Mass.App.Ct. 842, 852 (1999). See also, High Voltage Engineering Corp. v. American Employer’s Ins. Co., Civ. Act. No. 941033 (July 7, 1995) (4 Mass. L. Rptr. 1).
B. Intentional Property Damage at Shaffer Landfill
Commercial Union next argues that Gillette’s motion for summary judgment must fall because an insurance policy cannot insure against intentional property damage. G.L.c. 175, 47, cl. 6 precludes a company from insuring “any person against legal liability for causing injury, other than bodily injury, by his deliberate or intentional crime or wrongdoing ...” The fact that a wrongful act was committed intention *731 ally does not alone bar coverage. Andover Newton Theological School Inc. v. Continental Cas. Co., 409 Mass. 350, 352 (1991). That bar arises, only if an intentionally committed, wrongful act was also done deliberately or intentionally. Id. Indifferent reckless wrongdoing is not deliberate or intentional. Id.
Commercial Union bears the burden to respond with countervailing evidence as to a disputed issue of material fact. Here, it directs the court to the testimony of Robert Healy, Division Manager of Gillette’s Andover facility from 1968-74, and the Metcalf and Eddy report, which both referenced the disposal of aerosol cans in landfills and crushing them, and, further, that the materials in those cans would leak into the soil. Although Commercial Union fails to point to any evidence that during the relevant policy periods, Gillette deliberately contaminated Shaffer landfill, it does demonstrate that by 1971 Gillette knew that this disposal method was unacceptable, according to Met-calf and Eddy, and that the disposal of aerosol cans would leak into the soil. Although Commercial Union has not definitively demonstrated that Gillette intended the property damage, that was not its burden. “A toehold ... is enough to survive” summary judgment. Marr Equipment Corp. v. I.T.O. Corp. of New England, 14 Mass. 231, 235 (1982). In order to prevail at trial, Commercial Union still needs to demonstrate that Gillette knew to a substantial certainly those products were contaminants and that they would cause property damage; however, Robert Healy’s testimony and the Metcalf and Eddy Report are sufficient to create an issue of materially disputed fact as to whether Gillette intentionally polluted the Shaffer Landfill.
C. Expected or Intended Defense at South Boston Manufacturing Center
In its motion for summary judgment seeking dismissal of Commercial Union’s asserted expected or intended defense to claims for coverage to the South Boston Manufacturing Center (“SBMC”), Gillette first argues that Commercial Union has the burden of proving that Gillette’s pollution was unintended or unexpected. Second, it contends that there is no evidence that Gillette expected or intended property damage at the South Boston plant.
“The general rule governing . . . [is] that a plaintiff seeking to recover for breach of a duty or obligation created by a general clause of a contract, which also contains an exception descriptively limiting such duty or obligation must allege and prove that his cause of action is within the contract and outside the exception; but that where the exception is in another separate and distinct clause of the . . . contract defining . . . the duty or obligation, then the burden is upon the party relying on such exception.” Highland Insurance Co. v. Aerovox, 424 Mass. 226, 230 (1997), quoting Murray v. Continental Ins. Co., 313 Mass. 557, 563 (1943). “The insurer must show the applicability of the clause excluding coverage for injury or damage intended or expected by the insured.” Hanover Ins. Co. v. Talhouni, 413 Mass. 781, 785 (1992), citing McGinnis v. Aetna Life & Casualty Co., 398 Mass. 37, 38 (1986).
In the instant case, both in the primary and umbrella policies, the exception does not appear in the general clause of the contract, but in the separate and distinct part of the contract defining the duty or obligation. The primary policies obligate the insurer to “pay on behalf of [Gillette] all sums which [Gillette] shall become legally obligated to pay because of . . . property damage ... to which this insurance applies caused by an occurrence.” In the “Definitions” section, an “occurrence” means “an accident, including injurious exposure to conditions, which results, during the policy period, in bodily injury or property damage neither expected nor intended from the standpoint of the insured.”
Similarly, the umbrella policies bind Commercial Union to “indemnify the insured for all sums which the insured shall be obligated to pay by reason of the liability imposed on him by law ... for damages, and expenses, all as included in the definition of‘ultimate net loss,’ because of. . . property damage.” “Property damage” as amended includes various types of injury caused by an “occurrence.” “Occurrence” is then defined as “an accident... or an event, or continuous repeated exposure to conditions, which unexpectedly results in . . . property damage . . . during the policy period.”[19] As the exclusions appear in a separate and distinct part of the policies, Commercial Union must bear the burden of demonstrating that Gillette intended or expected the property damage that resulted from its conduct. Hanover Ins. Co. v. Talhouni, 413 Mass, at 785.
Contrary to Gillette’s averments, there is enough evidence to create a materially disputed issue of fact as to whether Gillette expected or intended property damage at the SBMC. In order to prevail on an unexpected or intended defense, Commercial Union must show either that Gillette actually intended the property damage or knew to a substantial certainty that property damage would result from its actions. Quincy Mut Fire Ins. Co. v. Abernathy, 393 Mass. 81, 83-84 (1984). All Commercial Union need show is evidence that at a minimum Gillette knew to a substantial certainty that its continual TCE disposal into City of Boston sewer would cause “some damage” to property. Utica Mut. Ins. Co. v. Hamel 46 Mass.App.Ct. 622, 635 (1999).
Commercial Union demonstrates a disputed issue of material fact over whether Gillette knew to a substantial certainty that TCE was entering the City of Boston sewer and, ultimately Fort Point Channel. Commercial Union directs this Court to the testimony of various Gillette employees and the expert report of Franklin E. Woodward, which states that “the on-site *732 chemical handling practices” at the Gillette plant constituted and resulted in the direct discharge of raw materials (solvents) and industrial wastes to the ground, contaminating soils and groundwater, which was, at the time, not accepted practice and Gillette knew these practices would result in damage to the environment." In addition to the multiple testimonies of Gillette personnel, this expert report is sufficient for Commercial Union to meet its burden of demonstrating that there remains a fact materially in dispute in order to survive Gillette’s motion for summary judgment as to the expected intended defense at SBMC. [20]
II. Commercial Union’s Partial Motion for Summary Judgment
A. Voluntary Payment Clause
Commercial Union, in its motion for summary judgment, first contends that Gillette’s breach of the voluntary payment clause (cooperation and assistance clause), [21] deprived Commercial Union of the opportunity to protect its interests, and that it may deny coverage based on violation of that clause. The general rule is that an insured’s noncompliance with a voluntary payment clause does not discharge the insurer’s contractual duty unless the insurer demonstrates actual prejudice. Sarnifel v. Peerless Ins. Co., 418 Mass. 295, 305-06 (1994); Employers’ Liab. Assur. Corp. v. Hoechst Celanese Corp., 43 Mass.App.Ct. 465, 479-81 (1997). In Augut v. Liberty Mut. Ins. Co., 410 Mass. 117, 123 (1991), the court explicitly held that prejudice would be presumed in a case such as this where prior to giving notice to its insurer, an insured had entered an agreement with the Commonwealth to clean up the site at its own expense. The Appeals Court reached similar results in both Atlas Tack Corp. v. Liberty Mutual Ins., 48 Mass.App.Ct. 378, 383 (1999), and Eastern Products Corporation v. Continental Cas. Co., 58 Mass.App.Ct. 16, 26 (2003). Contrary to Gillette’s averments, this court does not perceive those decisions to be inapplicable merely because it did not enter into any consent agreements or other agreements with the Massachusetts Department Environmental Protection (“DEP”) to commit funds to the South Boston. Nor does the lack of a judgment against Gillette render these decisions inapplicable. Gillette, through its participation in the MCP, completed Phases I-IV of the MCP, and spent at least $2,516,420 for clean-up activities before providing notice to Commercial Union by letter dated June 12, 2000. Phase I of the MCP is the initial site investigation. 310 C.M.R. 40.080. Phase II is the comprehensive site investigation. 310 C.M.R. 40.0830. Phase III is the identification, evaluation and selection of comprehensive remedial action alternatives. 310 C.M.R. 40.0850. Phase IV constitutes the identification, evaluation and selection of comprehensive action alternatives. 310 C.M.R. 40.0870. Environmental Resources Management submitted the Phase IV Remedy Implementation Plan on behalf of Gillette on June 29, 1999. Once the Phase IV report is submitted and approved by the DEP, the party must follow the operation, maintenance, and/or monitoring plan developed as part of the Remedy Implementation Plan in Phase IV under 310 C.M.R. 40.0874(3)(d). See 310 C.M.R. 40.0891.
Here, just as in these cases, through its participation in the Massachusetts Contingency Plan (“MCP”) the plaintiffs essentially entered into a binding agreement with the Commonwealth to clean up the properly at their own expense, and thereby caused prejudice to Commercial Union’s interests as a matter of law. Eastern Products Corporation, 58 Mass.App.Ct. at 26. This court therefore grants summary judgment in favor of Commercial Union because Gillette violated the voluntary payment provision of the insurance contract. Id.[22]
Gillette next argues that the voluntary payment clause in the umbrella policies does not apply to the present circumstances because it only applies when the underlying primary policies have not been exhausted. The voluntary payment clause in the umbrella policies provides as follows:
Assistance and Cooperation of the Insured: Except when the aggregate limits of liability under the policies of underlying insurance set forth in the Item 3 of the Declarations have been exhausted, the company shall not be called upon to assume charge of the settlement or defense of any claim made, suit brought or proceeding instituted against the insured but the company shall have the right and shall be given the opportunity to associate with the insured or the insured’s underlying insurers, or both, in the defense and control of any claim, suit or proceeding relative to an occurrence where, in the judgment of the company, the claim or suit involve or appear reasonably likely to result in liability for indemnity by the company under this policy, in which event the insured, any underlying insurers involved, and the company, shall cooperate in all things in the defense of such claim or suit.
With respect to any claim made, suit brought or proceeding instituted against the insured to which the policies of underlying insurance set forth in Item 3 of the Declarations will not apply because of the exhaustion of the aggregate limits of liability thereunder, if such claim, suit or proceeding is one which could result in liability of the company to indemnify the insured hereunder for damages, the company may, if it so elects, assume complete control of, the investigation, negotiations, settlement and defense of any such claims, suit or proceeding against the insured that it has so elected, the insured shall cooperate with the company and upon the company’s request, attend hearings and trials and assist in making settlements, securing and giving evidence, obtaining the attendance of witnesses and in the conduct of any legal proceedings in connection with the subject matter of this insurance. The insured shall not, except at its own cost voluntarily make any payment, assume any obligation or incur any expense other for such *733 immediate medical and surgical relief to others as shall be imperative at the time of the occurrence.
It is well-settled that the interpretation of a contract is a question of State law to be decided by the court. Krapf v. Krapf 439 Mass. 97, 105 (2003). “This is consistent with our long-standing policy that the rules governing the interpretation of insurance contracts are the same as those governing the interpretation of any other contract.” Money Store/Massachusetts, Inc., v. Hingham Mut. Fire Ins. Co., 430 Mass. 298, 301 (1999), quoting Somerset Sav. Bank v. Chicago Title Ins. Co., 420 Mass. 422, 427 (1995). Unambiguous language is given its natural and ordinary meaning. Maher v. Chase, 52 Mass.App.Ct. 22, 24 (2001), citing Coakley v. Maine Bonding & Cas. Co., 136 N.H. 402, 410, 618 A.2d 777 (1992). The doctrine of construing the language against the insurance company does not come into play unless a clause is ambiguous. Id.
Gillette seeks the court to declare that the voluntary payment clause applies only to circumstances in which the underlying insurance is inapplicable for reasons other than exhaustion of the limits of the underlying policies. The Commercial Union Assistance and Cooperation Clause consists of two paragraphs, each classifying two different situations. In the first paragraph, the policies refer to the Company’s liability “when the aggregate limits liability under the policies of underlying insurance .. . have been exhausted”; i.e. exhaustion of the policy. In contrast, the second paragraph of the Assistance and Cooperation Clause refers to “any claim made, suit brought or proceeding instituted against the insured to which the policies of underlying insurance . . . will not apply because the exhaustion of the aggregate limits thereunder ...”
Thus, the contract refers to the two different situations which distinguish the two functions of an umbrella policy. American Special Risk Ins. Co. v. A-Best Products, Inc., 975 F.Sup. 1019, 1022, 1025 (N.D.Ohio, 1997); Garmany v. Mission Insurance Co., 785 F.2d 941, 948 (11th Cir. 1986). The first paragraph refers to the situation in which the policy will provide vertical coverage when the primary insurance exhausts and the second paragraph addresses the situation in which the policy will “drop down” and provide horizontal coverage when the primary insurance does not provide coverage. Id. The final sentence of the second paragraph therefore refers only to the second situation, when the primary insurance does not provide coverage. Accordingly, the contract does not ambiguously use terms susceptible to more than one interpretation, but rather uses distinctly different terms and phrases to address different aspects of its coverage.
The voluntary payment clause is only triggered pursuant to the second function of the umbrella policy. Since Gillette’s claims are only implicated in the vertical coverage referenced in the first paragraph, the voluntary payment clause contained in the second paragraph does not apply and Commercial Union cannot deny Gillette coverage on that basis. Thus, as to the umbrellas policies, Gillette survives this motion for summary judgment.
B. Loss Payable
Commercial Union also seeks summary judgment as to the umbrella policies because Gillette failed to make a claim for expenses under the umbrella policies within twelve months of having made certain payments. In response, Gillette first argues that the loss payable provision does not bar recovery of Gillette’s pre-July 1, 2001 South Boston expenses. Secondly, Gillette argues that the loss payable provision cannot operate to bar Gillette from recovery under the umbrella policies because Commercial Union has not demonstrated actual prejudice. Lastly, Gillette argues that Commercial Union’s “Loss Payable” assertions improperly expand the reach of the provision.
According to the loss payable provision the insured was required to make a definite claim for any loss for which the company may be liable under the policies within twelve months of three disjunctive occurrences: 1) after the insured shall have paid an amount of ultimate net loss in excess of the amount borne by the insured; 2) after the insured’s liability shall have been fixed and rendered certain either by final judgment against the insured after actual trial; or, 3) by written agreement of the insured, the claimant and the company. Contrary to Gillette’s assertions, nothing in the language grants the insurer or the insured the right to elect any of the three options. The mere use of the disjunctive cannot be fairly read to give Gillette the right to elect either time in order to make a definite claim for any loss. The policies in fact dictate which option applies under a given set of circumstances, but is silent as to election of which occurrence may start the clock to run. The plain meaning of the provision indicates that there are three occurrences from which the time to make a definite claim will begin to run. This is particularly true in the context of the notification provision in which the words are used. This court sees no reason the insurer would want to limit the insured’s obligation to give notice of a claim. The insurer needs and expects the insured to notify it within twelve months of either of the three occurrences. Gillette’s argument to the contrary is unpersuasive.
Gillette next contends that the loss payable provision cannot operate to bar Gillette from recovery under the umbrella policies because Commercial Union has not demonstrated actual prejudice. In raising the “late notice” defense, the insurers assumed the burdens of establishing that the defendant insured was in breach of the notice provision of the policies and, further, that the breach resulted in prejudice to them as insurers. Employers’ Liabilily Assur. Corp., LTD v. Hoechst Celanese Corp., 43 Mass.App.Ct. 465, 472 (1997), citing Johnson Controls, Inc. v. Bowes, 381 Mass. 278, 282 (1980). G.L.c. 175, 112, which provides in relevant part;
*734 The liability of any company under. .. any .. . policy insuring against liability ... on account of property damage, or for loss or damage resulting therefrom, . . . shall become absolute whenever the loss or damage for which the insured is responsible occurs, and the satisfaction by the insured of a final judgment for such loss or damage shall not be a condition precedent to the right or duty of the company to make payment on account of said loss or damage . . . An insurance company shall not deny insurance coverage to an insured because of failure of an insured to seasonably notify an insurance company of an occurrence, incident, claim or of a suit found upon occurrence, incident or claim, which may give rise to liability insured against unless the insurance company had been prejudiced thereby.
The statutoiy language unequivocally commands that coverage should not be denied for late notice, unless the insurance company demonstrates prejudice. It is also clear that Section 112 was intended to apply to insurance contracts. Contrast Cheschi v. Boston, 39 Mass.App.Ct. 133, 141 (1995) (G.L.c. 175, 112 not applicable to two sophisticated businesses who negotiated an indemnification clause as part of a private contract). Commercial Union has not demonstrated actual prejudice to its interests in this case by showing that it has been “placed in a substantially less favorable position than it would have been in had timely notice been provided.” Darcy v. Hartford. Ins. Co., 407 Mass. 481, 487 (1990). Because Commercial Union fails to meet this burden, they do not prevail at summary judgment. Such reasons are sufficient to deny Commercial Union’s motion for summary judgment as to the loss payable provision in the umbrella policies.
III. G.L.c. 93A
Commercial Union seeks summary judgment on Gillette’s G.L.c. 93A claims because it has “substantial, meritorious coverage defenses applicable to Gillette’s Shaffer and SBMC claims . . .” Because Gillette is an entity engaged in trade or commerce for the purposes of G.L.c. 93A, as a matter of law, Gillette can bring suit only under section 11 of chapter 93A for a violation of section 2 of that chapter. The question for this Court is whether the conduct alleged by Gillette: Commercial Union’s failure to pay legitimate claims; Commercial Union’s bad faith and deceptive negotiating practices; its “spurious” rationale for suing its longtime policyholder; its failure to investigate Gillette’s claims and to determine coverage issues in a timely fashion; and its unilateral abdication of responsibilify to National Indemnity Company.
A. Plausible Claims
Although Commercial Union seeks summary judgment under section 11 of G.L.c. 93A, the facts viewed in a light most favorable to Gillette show that Commercial Union has substantial, meritorious coverage defenses for SBMC and Shaffer site claims. In determining whether an insurer’s liability was “reasonably clear” Commercial Union can prevail at summary judgment if it demonstrates, in absence of countervailing evidence, that it relied on plausible interpretations of its policies. Boston Symphony Orchestra, Inc. v. Commercial Union Ins. Co., 406 Mass. 7, 15 (1989). Reading the policy language in its usual and ordinary sense, Somerset Sav. Bank v. Chicago Title Ins. Co., 420 Mass. 422, 427 (1995), it is evident that “a reasonable person, with knowledge of the relevant facts and law” would not necessarily conclude that Commercial Union was liable to Gillette for the majority of its claim. Demeo v. State Farm Mut. Auto Ins. Co., 38 Mass.App.Ct. 955, 956 (1995). The testis “whether a reasonable person, with knowledge of the relevant facts and law, would probably have concluded, for good reason, that the insurer was liable to the plaintiff.” Demeo, 38 Mass.App.Ct. at 957-57.
In the instant case, Gillette filed a claim with Commercial Union in which it sought to recover costs and seek future costs it has incurred or may continue to incur in its response to claims asserted by the United States Environmental Protection Agency at Shaffer Landfill and for costs incurred in relation to contamination from SBMC. Commercial Union entered into negotiations with Gillette to settle these claims, and the negotiations discontinued when Commercial Union filed this lawsuit. Commercial Union asserts several policy exclusions in denying Gillette coverage, several of which are the subject of this decision.
It is evident that “a reasonable person, -with knowledge of the relevant facts and law” would not necessarily conclude that Commercial Union was liable to Gillette for the majority of its claim. Demeo, 38 Mass.App.Ct. at 956-57. “ ‘Liability under . . . 93A does not attach merely because an insurer concludes that it has no liability under an insurance policy’. . . A plausible reasoned legal position that may ultimately turn out to be mistakenor simply... unsuccessfulis outside the scope of punitive aspects of the . . . application of 93A . . .” Guity v. Commerce Ins. Co., 36 Mass.App.Ct. 339, 343 (1994). See also M. Dematteo Constr. Co. v. Century Indemnity Co., 182 F.Sup.2d. 146, 164 (D.Mass. 2001). Because liability under the policy is not clear, Commercial Union is entitled to summary judgment to the that extent the 93A claim seeks damages on account of denial of coverage.
B. Unfair and Deceptive Practices
For the G.L.c. 93A allegation, not based on denial of coverage, the analysis does not end here. Gillette claims that Commercial Union’s failure to investigate Gillette’s claim regarding Shaffer Landfill; its failure to independently investigate the South Boston claim; its encouragement and then cessation of settlement negotiations; and Commercial Union’s transfer of Gillette’s claims to National Indemnity Company (“NICO”) all evidence bad faith sufficient to create an issue of materially disputed fact under G.L.c. 93A. This court agrees.
*735 Furthermore, the Supreme Judicial Court determined that “the analysis required under 11 should not be based on a test identified by any particular factor or factors because of a tendency to shift the focus of inquiry away from the purpose and scope of 93A. Section 11 suggests an approach in which a judge should, after making findings of fact” make a determination (emphasis added). Kwaiti Danish Computer Co. v. Digital Equipment Co., 438 Mass. 459, 473-74 (2003). The existence of several issues of fact is made out from the allegations of the complaint-is such that Gillette’s G.L.c. 93A claims survive this motion for summary judgment. Noyes v. Quincy Mut. Fire Ins. Co., 7 Mass.App.Ct. 723, 726 (1979).

ORDERS

With regard to the Gillette Corporation’s South Boston Manufacturing Center site, Commercial Union’s Motion for Partial Summary Judgment is ALLOWED as a matter of law as to the PRIMARY Commercial Union policies and is DENIED as to the EXCESS Commercial Union Policies as there are genuine issues of material fact in dispute. The defendant, Gillette Company’s Motion for Partial Summary Judgment as to the South Boston site is DENIED as a matter of law as to the PRIMARY Commercial Union policies and DENIED as to the EXCESS Commercial Union Policies as there are genuine issues of material fact in dispute.
With regard to the Shaffer Landfill site in Billerica, Massachusetts, Gillette Corporation’s Motion for Partial Summary Judgment is DENIED, as there are genuine issues of material fact in dispute.
With regards to Gillette Corporation’s claims under ch. 93A that Commercial Union engaged in unfair and deceptive practices, Commercial Union’s Motion for Partial Summary Judgment is AJJLDWED to the extent that the ch. 93A claim seeks damages on account of the denial of coverage, and is DENIED as to all other of Gillette Company’s claims under ch. 93A as there are genuine issues of material fact in dispute.

Whether these releases were accidental leaks or intentional discharges is an issue that is contested by the parties.

Gillette disputes this fact and maintains that the subject of the claims in this case were not discovered until 1996, not 1994, and communications with the Department of Environmental Protection with respect to this contamination did not occur prior to 1996. This dispute is not material to the current motion.

Gillette disputes this fact and claims that the amount of the claim incurred on or before June 12, 2000 is $2,355,133.

These facts are stated in the “Expert Report of Peter J. Riordan.” This court has not mled on the motions to strike this evidence. The report states, in relevant part, as follows:
Overall Conclusions: Based on evaluation of the site data and site historical information, I conclude that Shaffer Landfill was contaminated at least by 1963 and possibly earlier, with commercial/industrial chemicals and solvents. I also conclude, based on the expected rates of ground water movement in the unsaturated zone, that the ground water at the Shaffer Landfill was contaminated with commercial/industrial chemicals by 1963. Additional disposal of these materials continued to occur throughout the 1960s and beyond, and likely created additional sources of contamination to groundwater.

This report is also subject to a motion to strike. The “Expert Report of Richard T. Dewling” states as follows:
During the period 1968-1972, commercial wastes generated at the South Boston facility were disposed of by Gillette and/or Suffolk Services at the Iron Horse Park Superfund Site, Shaffer Landfill Operable Unit. These wastes, which included consumer products, “off-spec" products/containers, and office trash would have contained small amounts of hazardous substances. These disposal operations were consistent with the common and accepted industrial and government practices of the period.

The Environmental Protection Agency Evidentiary Summary evidences that from 1968-1972 Gillette sent trash to Shaffer Landfill from the South Boston site, and the trash contained Gillette personal care products and those products contained hazardous substances. This is also the subject of a motion to strike.

Commercial Union denies the existence of the duty to defend in situations in which the primary policies were not exhausted.

The primary policies each provide as follows:
4. Insured’s Duty in the Event of Occurrence, Claim or Suit:
(c) The insured shall cooperate with the company, and, upon the company’s request, assist in making settlements, in the conduct of suits and in enforcing any right of contribution or indemnity against any person or organization who may be liable to the insured because of bodily injury or property damage with respect to which insurance is afforded under this policy; and the insured shall attend hearings and trials and assist in securing and giving evidence and obtaining the attendance of witnesses. The insured shall not, except at his own cost, voluntarily make any payment, assume any obligation or incur any expense other than for first aid to others at the time of accident.

From October 1, 1963 though October 1, 1983, the entire Assistance and Cooperation Condition provided as follows:
Assistance and Cooperation of the Insured: Except when the aggregate limits of liability under the policies of underlying insurance set forth in the Item 3 of the Declarations have been exhausted, the company shall not be called upon to assume charge of the settlement or defense of any claim made, suit brought or proceeding instituted against the insured but the company shall have the right and shall be given the opportunity to associate with the insured or • the insured’s underlying insurers, or both, in the defense and control of any claim, suit or proceeding relative to an occurrence where, in the judgment of the company, the claim or suit involve or appear reasonably likely to result in liability for indemnity by the company under this policy, in which event the insured, any underlying insurers involved, and the company, shall cooperate in all things in the defense of such claim or suit.
With respect to any claim made, suit brought or proceeding instituted against the insured to which the policies of underlying insurance set forth in Item 3 of the Declarations will not apply because of the exhaustion of the aggregate limits of liability thereunder, if such claim, suit, or proceeding is one which could result in liability of the company to indemnify the insured hereunder for damages, the company may, if it so elects, assume complete control of the investigation, negotiations, settlement and defense *736 of any such claims, suit or proceeding against the insured that it has so elected, the insured shall cooperate with the company and upon the company’s request, attend hearings and trials and assist in making settlements, securing and giving evidence, obtaining the attendance of witnesses and in the conduct of any legal proceedings in connection with the subject matter of this insurance. The insured shall not, except at its own cost, voluntarily make any payment, assume any obligation or incur any expense other for such immediate medical and surgical relief to others as shall be imperative at the time of the occurrence.

This is the language which appears in the umbrella policies during October 1, 1963 through October 1, 1976. The policies after this contain different language.

The primary policies issued for October 1,1969-October 1, 1970 and the umbrella policies issued for October 1, 1963-October 1, 1971.

Gillette cites to Riordan Rep. 2-3 for the proposition that “occurrences” happened between during 1963-71.

The “Expert Report of Peter J. Riordan” states as follows:
Overall Conclusions: Based on evaluation of the site data and site historical information, I conclude that Shaffer Landfill was contaminated at least by 1963 and possibly earlier, with commercial/industrial chemicals and solvents. I also conclude, based on the expected rates of ground water movement in the unsaturated zone, that the ground water at the Shaffer Landfill was contaminated with commercial/industrial chemicals by 1963. Additional disposal of these materials continued to occur throughout the 1960s and beyond, and likely created additional sources of contamination to groundwater.

The “Expert Report of Richard T. Dewling” states as follows:
During the period 1968-1972, commercial wastes generated at the South Boston facility were disposed of by Gillette and/or Suffolk Services at the Iron Horse Park Superfund Site, Shaffer Landfill Operable Unit. These wastes, which included consumer products, “off-spec” products/containers, and office trash would have contained small amounts of hazardous substances. These disposal operations were consistent with the common and accepted industrial and government practices of the period.

October 1, 1969-October 1, 1970 and October 1, 1963-1971 respectively.

The umbrella policies include the following definitions:
Ultimate Net Loss: The term “ultimate net loss” shall mean the total sum which the insured or any company as his insurer, or both, becomes legally obligated to pay as damages because of personal injury, property damage, or advertising liabiliiy claims, either through adjudication or compromise, and shall also include hospital, medical and funeral charges and all sums paid as salaries, wages, compensation, fees, charges and law costs, premiums on attachment or appeal bonds, interests on judgments, expenses for doctors, lawyers, nurses, and investigators and other persons, and for litigation, settlement, adjustment and investigation of claims and suits which are paid as a consequence of any occurrence covered hereunder, excluding only the salaries of the named insured’s or of any underlying insurer’s permanent employees. The company shall not be liable for any expenses as aforesaid when the payment of such expenses is included in other valid and collectible insurance.
Occurrence: The term “occurrence” shall mean (a) an accident, or (b) an event or continuous event or repeated exposure to conditions, which unexpectedly results in personal injury, property damage, or advertising liabiliiy (either alone or in combination) during the policy period. With respect to coverages [for personal injury and property damage], except with respect to Products-Completed Operations Hazards, all personal injury and property damage (either alone or in combination) arising out of one event or continuous repeated exposure to substantially the same general conditions existing at or emanating from one premises location shall be deemed to be one occurrence. With respect to coverages [for personal injury and property damage], all personal injury and property damage (either alone or in combination) arising out of the Products-Completed Operations Hazards shall be deemed to be one occurrence if arising out of one lot of goods or products prepared or acquired by the named insured or other trading under his name . . .

The primary policies include the following definition:
“[OJccurrence” means an accident, including injurious exposure to conditions, which results, during the policy period, in bodily injury or properly damage neither expected nor intended from the standpoint of the insured.

Note also, that under the “Exclusions” section, the policies state, “This policy does not apply to . . . property damage, caused intentionally by or at the direction of the insured.”

Commercial Union prevails upon this court to infer Gillette’s intent as a matter of law. “Inferring intent to injure as a matter of law in construing an exclusionary clause has been recognized in only three situations: an adult’s unlawful sexual behavior, Worcester Ins. Co. v. Fells Acre Day Sch., 408 Mass. 393, 400 (1990); setting fire to a building, Newton v. Krasnigor, 404 Mass. 682, 685 (1989), and pushing a person down a staircase. Terrio v. McDonough, 16 Mass.App.Ct. 163, 169 (1983).” Preferred Mut. Ins. Co. v. Gamache, 42 Mass.App.Ct. 194, 200-01 1997). Without ruling on this issue, it is clear that Gillette’s conduct does not fall within any of these categories. Because this Court finds a materially disputed fact as to Gillette’s intentional pollution of the SBMC, there is no need to decide whether this Court should infer as a matter of law, Gillette’s intent to cause property damage.

The primary policies provide in relevant part as follows:
4. Insured’s Duly in the Event of Occurrence, Claim or Suit:
(c) The insured shall cooperate with the company, and, upon the company’s request, assist in making settlements, in the conduct of suits and in enforcing any right of contribution or indemnity against any person or organization who may be liable to the insured because of bodily injury or property damage with respect to which insurance is afforded under this policy; and the insured shall attend hearings and trials and assist in securing and giving evidence and obtaining the attendance of witnesses. The insured shall not, except at his own cost, voluntarily make any payment, assume any obligation or incur any expense other than for first aid to others at the time of accident.

Gillette contends that the voluntary payment clause has no applicability to South Boston costs incurred after Gillette sent notice of the claim to Commercial Union. Such an argument is without merit. Unlike Sarnfil, Inc. v. Peerless Ins. Co., 418 Mass. 295, 305 (1994), in which factual disputes over whether the insured had an opportunity to protect its interests were present here there is no such dispute. By virtue of its commitment to complete the MCP process, Commercial Union did not have an opportunity to protect its interest. Therefore, this Court finds that the voluntary payment clause applies to South Boston costs incurred after Gillette sent notice of the claim to Commercial Union.