STEVEN K. FEINBERG, trustee,[1] *vs.* COMMERCIAL UNION
INSURANCE COMPANY & another.[2]

No. 99-P-1889.

Essex. December 13, 2001. - April 26, 2002.

Present: JACOBS, KANTROWITZ, & KAFKER, JJ.

*Insurance,* Pollution exclusion clause. *Indemnity.*

In a civil action against two insurance companies for indemnification in an
environmental liability suit, the judge properly granted summary judgment
to the insurers, where there was no genuine issue of material fact that the
chemical substances that leached into the ground and groundwater from
burning rubber on the plaintiff's property were "pollutants" under the poli-
cies, and therefore excluded from coverage. [591-593]

CIVIL ACTION commenced in the Superior Court Department on
December 8, 1997.

The case was heard by *Howard J. Whitehead,* J., on motions
for summary judgment, and an entry of separate and final judg-
ment was ordered by *Joseph A. Grasso, Jr.,* J.

*Stephanie A. Kiefer* for the plaintiff.

*Kevin J. O'Connor (Peter G. Hermes* with him) for Com-
mercial Union Insurance Company.

*Paul M. Richardson* for Merchants Mutual Insurance Company.

*Laura A. Foggan, Daniel E. Troy, & Timothy R. Holbrook,* of
the District of Columbia, *& Michael R. Coppock & Carlene A.
Pennell,* for Insurance Environmental Litigation Association, am-
icus curiae, submitted a brief.

KANTROWITZ, J. The plaintiff commenced this action[3] against

---

[1] Of Ballardview Realty Trust.

[2] Merchants Mutual Insurance Company, also known as Merchants Insur-
ance Group.

[3] The original plaintiffs in this case were Eastern Products Corporation;
Steven Feinberg, as trustee of Ballardview Realty Trust; and Marjorie

Commercial Union Insurance Company (Commercial Union), Merchants Mutual Insurance Company, also known as Merchants Insurance Group (Merchants), and several other insurance companies,[4] seeking a declaration that the general liability insurance policies issued by those insurers obligated them to defend and indemnify the plaintiff in any environmental liability suit brought against the plaintiff, either by a third party or the Department of Environmental Protection (DEP).[5] We hold that the plaintiff is not entitled to such coverage due to the pollution exclusion clauses contained in the Commercial Union and Merchants policies and, therefore, affirm the summary judgment entered in favor of Commercial Union and Merchants.

*Facts.* In 1972, Robert Feinberg, now deceased, purchased property at 18-20 Dale Street, Andover, on which he ran, under the name of Eastern Products Corporation (EPC), a rubber products manufacturing business. Robert was EPC's president and majority shareholder. At Robert's death in 1986, title to the property passed to his widow, Marjorie Feinberg. In December, 1987, Marjorie sold most of the property to the Ballardview Realty Trust (BRT), a real estate trust that is beneficially owned by Steven and James Feinberg, sons of Robert and Marjorie. BRT and Marjorie Feinberg are the present owners of these parcels.

EPC operated its business on the premises from 1972 to 1992. EPC's process for manufacturing rubber products involved grinding rubber feedstock for later use on athletic surfaces and for compounding filler for industrial uses. EPC also stored rubber feedstock on the property from 1972 to 1988. Seven fires on the rubber stockpiles occurred between 1977 and 1985, thought to have been ignited by neighborhood youths. The plaintiff estimated that between 5.6 and 6.5 million pounds of stockpiled rubber burned during these fires.

During 1986 and 1987, BRT proposed to construct a 139-unit

Feinberg. Only Steven Feinberg, as trustee of Ballardview Realty Trust, appeals.

[4]The remaining defendants in the underlying lawsuit are not parties to this appeal.

[5]The amended complaint also sought damages for breach of contract, and violations of G. L. c. 93A and G. L. c. 176D against each of the defendant insurers.

housing project on its portion of this property. BRT applied to the Andover Zoning Board of Appeals for approval for this housing project, and commissioned several environmental surveys of the property.

The first of these assessments was performed in 1986 by Goldberg-Ziono & Associates (GZA). The GZA report stated that, while there were volatile organic compounds (VOCs) and volatile hydrocarbons present, the site conditions were not a threat to public health or safety. A 1987 report performed by IEP, Inc., opined that it was "highly unlikely that the Massachusetts Department of Environmental Quality and Engineering (DEQE)[6] would require any type of cleanup of the ground water at the site." In 1987, Meta Systems, Inc., also evaluated the site, concluding that the activities of EPC did not pose a threat to EPC workers or nearby residents. This report stated that the National Institute for Occupational Safety and Health, the Health Committee of the Rubber Manufacturers Association, the National Tire Dealers and Retreaders Association, and the American Recappers Association had not reported any potential health risk due to exposure to rubber particles.

Notwithstanding these reports, both the soil and groundwater were contaminated: the soil with VOCs, the groundwater primarily with hydrocarbons. Because of the contamination on the property, the Andover Zoning Board of Appeals gave approval for the housing project with a reduced number of units,[7] making the project economically unfeasible for BRT.

In 1986, EPC notified DEP of the results of the GZA environmental survey and report. Further testing revealed that petroleum hydrocarbons in the ground water exceeded the limits established in the Massachusetts Contingency Plan (MCP), 310 Code Mass. Regs. §§ 40.0000. In October, 1988, DEP

---

[6] "The Department of Environmental Protection [DEP] is the successor agency to the [DEQE]. See St. 1989, c. 240, § 101." *Taygeta Corp.* v. *Varian Assocs.,* 436 Mass. 217, 219 n.3 (2002). We refer to DEP throughout this opinion.

[7] It is unclear from the record on appeal why a reduced number of units was allowed despite the contamination. The record also does not indicate the number of units ultimately approved.

designated the property as a "Location to be Investigated."[8] In October, 1991, BRT applied for a waiver of approvals[9] under the MCP, which DEP granted in April, 1992. In July, 1992, the property status was changed to a "Confirmed Disposal Site."[10] In 1996, BRT obtained reports from two environmental consultants, Mayfly Environmental and Paragon Environmental Services, Inc., both of which concluded that the contamination on the premises resulted from either the earlier fires on the rubber stockpiles or leaching into the soil contaminated by the pyrolytic release. In June, 1998, BRT received a Notice of Responsibility and Noncompliance (NOR/NON)[11] from the DEP, pursuant to G. L. c. 21E.

Merchants insured the property for four consecutive terms, commencing annually from December, 1988, through December, 1992. In all four policies, Merchants agreed to pay "on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of . . . property damage to which this insurance applies . . . ." The first and second policies contained a pollution exclusion provision, which stated that the insurance did not apply "to any loss, cost or expense arising out of any governmental direction or request that the named insured test for, monitor, clean up, remove, contain, treat, detoxify or neutralize pollutants." The third and fourth policies contained the following pollution exclusion clause:

---

[8]The notice from DEP states that a "Location To Be Investigated" is one where "oil or hazardous materials may have been released to the environment, and which therefore warrant a preliminary assessment . . . . Inclusion of a location on this list does not imply that a release of oil or hazardous materials has been confirmed. It does mean that [DEP] has received sufficient information to warrant an initial investigation."

[9]A waiver of approvals, before the 1993 changes to G. L. c. 21E, allowed for potentially responsible parties of nonpriority disposal sites to be excluded from certain DEP requirements of the remediation process. See 310 Code Mass. Regs. § 40.536-537 (1988).

[10]Under G. L. c. 21E, § 2, a disposal site is "any structure, well, pit, pond, lagoon, impoundment, ditch, landfill or other place or area, excluding ambient air or surface water, where uncontrolled oil or hazardous material has come to be located as a result of any spilling, leaking, pouring, abandoning, emitting, emptying, discharging, injecting, escaping, leaching, dumping, discarding or otherwise disposing of such oil or hazardous material."

[11]The NOR/NON states that "[t]he purpose of this notice is to inform you of your legal responsibilities under state law for assessing and/or remediating the subject release pursuant to the MCP."

"This insurance does not apply to:

"(1) 'Bodily injury' or 'property damage' arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of pollutants at any time.

"(2) Any loss, cost or expense arising out of any:

"(a) Request, demand or order that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of pollutants; or

"(b) Claim or suit by or on behalf of any governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of pollutants."

Commercial Union provided insurance coverage for the property effective December 3, 1992, and ending December 3, 1995. The pollution exclusion language in Commercial Union's policies were identical to the language contained in the third and fourth policies issued by Merchants.

In January, 1995, BRT submitted a written notice of claim and demand for defense to Merchants regarding this environmental liability, and submitted a similar notice to Commercial Union in May, 1997. Commercial Union responded on August 7, 1997, and denied any obligation to defend or indemnify BRT. BRT submitted further demand letters to Merchants in March, 1995; May, 1997; and October, 1997; and to Commercial Union on September 30, 1997. Neither insurer has undertaken to defend or indemnify BRT in proceedings brought by the DEP.

*Pollution exclusion clauses.* BRT argues that the Superior Court erred in granting summary judgment in favor of Commercial Union and Merchants based on the pollution exclusion clauses in the policies. The basic question is whether a genuine issue of material fact exists that the substances that leached into the ground and groundwater are "pollutants" under the policies. See *Cassesso* v. *Commissioner of Correction*, 390 Mass. 419, 422 (1983). Both policies define pollutants as "any solid, liquid, gaseous, or thermal irritant or contaminant including smoke,

vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed."

The words of the insurance policy must be construed "according to the fair meaning of the language used, as applied to the subject matter." *Jacobs* v. *United States Fid. & Guar. Co.*, 417 Mass. 75, 76 (1994). Although doubts as to ambiguous policy provisions in exclusionary clauses will be construed against the insurer, see *Cody* v. *Connecticut Gen. Life Ins. Co.*, 387 Mass. 142, 146 (1982), the pollution exclusions here are notably unambiguous; they are plainly intended to bar coverage of the environmental damage to BRT's property. Where the words of an insurance contract are not ambiguous, "they must be construed in their usual and ordinary sense." *Jacobs, supra* at 77. We will "consider what an objectively reasonable insured, reading the relevant policy language, would expect to be covered." *Hazen·Paper Co.* v. *United States Fid. & Guar. Co.*, 407 Mass. 689, 700 (1990).

BRT first argues that the rubber feedstock, tires, and other rubber materials used and stored by EPC were useful products, and therefore should not be considered "pollutants" under the policy exclusion, citing *Atlantic Mut. Ins. Co.* v. *McFadden*, 413 Mass. 90 (1992), and *Western Alliance Ins. Co.* v. *Gill*, 426 Mass. 115 (1997). It is irrelevant that the stockpiled rubber materials might be useful products, because BRT's liability arises out of the release of specific chemicals into the soil and groundwater, not the storage of rubber feedstock.[12]

The Supreme Judicial Court interpreted the pollution exclusion language that is now before us in both *McFadden* and *Gill*. Coverage in *McFadden* was not excluded where the insured was sued for personal injuries caused. by exposure to lead paint in a private residence. In *Gill*, the pollution exclusion clause did not exclude coverage for personal injuries resulting from exposure to carbon monoxide fumes from a malfunctioning oven while dining at a restaurant. In both cases, the standard applied was what an

---

[12]Although we do not decide the case on precisely the same ground relied upon by the motion judge, i.e., that the stockpiled rubber was waste and, therefore, pollution, a correct ruling of the trial court will be upheld, even if the appellate court relies on a different ground. *Kelly* v. *Avon Tape, Inc.*, 417 Mass. 587, 590 (1994).

insured would have reasonably understood the provision at issue to cover. *McFadden, supra* at 92; *Gill, supra* at 117, 120.

A reasonable policyholder would likely determine that chemical substances leaching into the ground and groundwater from burning rubber, seemingly a classic case of pollution, constitute pollution within the meaning of the policy. In *McFadden* and *Gill*, the court noted that a reasonable insured would anticipate the exclusion of claims for industrial or environmental pollution, but not the type of personal injury claims present in those cases. *McFadden, supra* at 92 ("an insured could reasonably have understood the provision at issue to exclude coverage for injury caused by certain forms of industrial pollution, but not coverage for injury allegedly caused by the presence of leaded materials in a private residence"); *Gill, supra* at 120 (while reasonable policyholder might well understand carbon monoxide is pollutant when it is emitted in industrial or environmental setting, reasonable policyholder would not characterize carbon monoxide from malfunctioning oven as "pollution").

Exclusion provisions should be interpreted in a "common-sense manner with due attention to the circumstances of the accident giving rise to a coverage claim." *Id.* at 118. Environmental contamination claims like those brought by DEP against BRT in this case are within the scope of the pollution exclusion. See *McFadden, supra* at 92; *Gill, supra* at 120.[13]

*Judgment affirmed.*

---

[13]The plaintiff makes further arguments on appeal, which are not dispositive. First, the plaintiff argues that the rubber feedstock stored at the site to be recycled was not "waste" within the policy definition. As discussed above, the contamination caused by either the fires or leaching is sufficient to invoke the pollution exclusion; the status of the rubber feedstock is irrelevant.

Second, the plaintiff argues that even if the chemicals are "pollutants" as defined in the policies, the hostile fires exception to the pollution exclusion clause mandates coverage. This claim is also without merit; the hostile fires provisions of both Merchant's and Commercial Union's policies are expressly made inapplicable to the specific provisions of the pollution exclusion clauses applicable in the instant case, regarding governmental environmental suits.

The plaintiff also argues that the G. L. c. 93A and G. L. c. 176D claims were improperly dismissed. Because Merchants and Commercial Union had no obligation to defend BRT in the DEP proceedings, such claims cannot stand. See *Macoviak* v. *Chase Home Mort. Corp.*, 40 Mass. App. Ct. 755, 760 (1996); *GTE Prods. Corp.* v. *Broadway Elec. Supply Co.*, 42 Mass. App. Ct. 293, 302 (1997).