Neel, J.
This case arises from an accidental release of ferric chloride, an acid used by plaintiff Eastern Reproduction Corporation (Eastern) in its metal etching business, at Eastern’s Waltham premises. Eastern seeks coverage from its insurer, defendant SEACO Insurance Company (SEACO), for property damage, cleanup costs, and lost profits, as well as for a claim of personal injury allegedly sustained by an employee on neighboring business premises. SEACO refuses coverage, based upon policy exclusions of claims arising from pollution and from negligent work. SEACO moves for summary judgment as to both counts of the complaint (breach of contract, and violation of G.L.c. 93A and c. 176D). Eastern moves for partial summary judgment as to liability on its claims, and as to SEACO’s counterclaim for declaratory judgment. For the reasons set forth below, the parties’ respective motions are allowed in part and denied in part.
*172 BACKGROUND
The following facts are in substance uncontested. Eastern is a manufacturer of metal products, including printed circuit boards, jewelry, and ornaments, produced by a process of etching through the controlled use of acid on metal. Its manufacturing facility is located in a multi-tenant commercial building at 1250 Main Street, Waltham, Massachusetts. One acid which Eastern uses as the “etchant” is ferric chloride. In 1998, Eastern stored virgin ferric chloride in a 5,000 gallon above-ground storage tank located outside its facility. That tank pumps the solution to a 500 gallon above-ground “day tank” located inside the building. The smaller tank feeds the solution directly to the etching machines located in the production area. Transfer of ferric chloride occurs on an as-needed basis by manual operation of the pump and two valves.
On June 2, 1998, when Daniel Ventura, an Eastern employee, left the premises at the end of the work day, he neglected to turn off the ferric chloride pump and the valves, allowing ferric chloride to continue to flow to an etching machine. His error, which was not discovered until the next morning, resulted in up to 1,100 gallons of ferric chloride overflowing from the etching machine onto the facility’s ground floor. Some of the overflow spilled onto a water pipe, and some leaked through the ground floor to the basement floor of Eastern’s facility. The water pipe was corroded by the ferric chloride, and consequently discharged an amount of water substantially in excess of the spilled ferric chloride. The resulting flooding diluted at least some of the ferric chloride, and damaged the interior of Eastern’s facility and that of a co-tenant. In addition, an employee of another tenant sought medical attention allegedly necessitated by the spill. Eastern’s on-site consultant also reported observation of a relatively small amount of ferric chloride discharging into the sewer system.[1] Other evidence indicates that at least a portion of the ferric chloride discharged into the sewer system was diluted.
The ferric chloride which Eastern used in its production process was in liquid, chemical solution form. It was orange-brown in color, was highly acidic (pH less than 1), and had a slightly acrid odor. It was non-flammable and posed no explosion hazard. Its manufacturer recommended “neutraliz[ing]” with lime, limestone, or soda ash. See Material Safety Data Sheet attached to the Sakakeeny letter.
SEACO issued a Businessowner’s Policy of Insurance to Eastern effective October 21, 1997 through October 21, 1998 (policy). The policy provided property and liability insurance coverage with respect to Eastern’s premises, subject to certain exclusions discussed below.
DISCUSSION
The central question raised by the motions for summary judgment is whether the spill of ferric chloride on June 2-3, 1998, falls within the pollution exclusion of the policy issued to Eastern by SEACO. A secondary question is whether, even if the spill and resulting damage are not excluded by the pollution exclusion, the policy’s “negligent work” exclusion defeats Eastern’s claim.
I. Pollution Exclusion
The policy’s property damage coverage form includes, at B.2., the following exclusion from coverage for Eastern’s business property:
2. We will not pay for loss or damage caused by or resulting from any of the following:
j. Pollution: We will not pay for loss or damage caused by or resulting from the discharge, dispersal, seepage, migration, release or escape of “pollutants” unless the discharge, dispersal, seepage, migration, release or escape is itself caused by any of the “specified causes of loss.” But if loss or damage by the “specified causes of loss” results, we will pay for the resulting damage caused by the “specified cause of loss.”
The form defines “pollutants,” at H.4., as “any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.”
The policy’s liability form, for present purposes, covers claims not excluded by the property form.
Eastern argues, in substance, that the pollution exclusion is not applicable because the ferric chloride was not a “pollutant,” as defined by the policy. SEACO argues that the ferric chloride was a pollutant; that its release and resulting damage was not caused by any of the “specified causes of loss” (specifically, as that term is defined at H.6. of the property coverage form, water damage); and therefore that the pollution exclusion applies.
In Feinberg v. Commercial Union Ins. Co., 54 Mass.App.Ct. 587, 592 (2002), the court stated that “(ejxclusion provisions should be interpreted in a commonsense manner with due attention to the circumstances of the accident giving rise to a coverage claim.” In this case, the circumstances involve a train of events that began with the act or omission of an employee, and ended with different results in different locations. Specifically, the employee’s failure to shut off the ferric chloride pump and valves caused the ferric chloride to overflow inside plaintiff s facility and, among other things, to corrode the water pipe which then caused flooding inside the building, and related damage and cleanup. Separately, some amount of the ferric chloride, in diluted or undiluted form, escaped outside the building into a sewer line and catch basin. After reviewing the authorities cited by the parties, the Court concludes that the release of ferric chloride into the sewer system is plainly among the events which a reasonably objective insured would expect to be excluded under the pollution exclusion, while damage to *173 a water pipe and subsequent damage to commercial businesses is a risk a reasonably objective insured would expect to be covered under the policy.
The Court’s analysis begins with Atlantic Mutual Ins. Co. v. McFadden, 413 Mass. 90 (1992), which held that lead poisoning of two children was not within the plaintiff insurer’s pollution exclusion, a provision substantially similar to that at issue here. Atlantic Mutual argued that lead in paint, putty, or plaster, while not specifically listed in the pollution exclusion as a “contaminant” or “irritant,” “falls within either or both of those categories and therefore is properly classified as a ‘pollutant’ for purposes of the exclusion provision.” Id. at 91. The court states that, when construing language in an insurance policy, “we ‘consider what an objectively reasonable insured, reading the relevant policy language, would expect to be covered’ ” (citation omitted), and concludes that “an insured could reasonably have understood the provision at issue to exclude coverage for injury caused by certain forms of industrial pollution, but not coverage for injury allegedly caused by the presence of leaded materials in a private residence.” Id. at 92. The court observes that, rather than denoting leaded materials, the terms used in the pollution exclusion, “such as ‘discharge,’ ‘dispersal,’ ‘release,’ and ‘escape,’ are terms of art in environmental law which generally are used with reference to damage or injuiy caused by improper disposal or containment of hazardous waste.” Id.
In Western Alliance Ins. Co. v. Gill, 426 Mass. 115 (1997), the court construed the same pollution exclusion provision at issue in McFadden in a case in which the plaintiff, a patron at the insured’s restaurant, was exposed to carbon monoxide fumes from an improperly vented oven. The court stated that
there is a difference between lead paint poisoning and carbon monoxide poisoning, and between a private residence and a business. Nonetheless, we think that the construction given to the exclusion in McFadden also applies in this case.
In addition to inclusion of the terms “discharge,” “dispersal,” “release,” and “escape,” the exclusion’s definition of “pollutants” endeavors to particularize the more general words “irritant or contaminant” by reference to “smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste.” Each of the latter words brings to mind products or byproducts of industrial production that may cause environmental pollution or contamination.
The exclusion should not reflexively be applied to accidents arising during the course of normal business activities simply because they involve a “discharge, dispersal, release or escape” of an “irritant or contaminant” . . .
Id. at 118.
The court cites with approval the observation, in American States Ins. Co. v.Kolorns, 177 Ill.2d 473, 493 (Oct. 17, 1997), slip op. at 16, that “the history of the pollution exclusion indicates that the provision was drafted to avoid enormous expense of environmental litigation...,” and quotes from that case the following: “ ‘[w]e would be remiss, therefore, if we were to simply look to the bare words of the exclusion, ignore its raison d’etre, and apply it to situations which do not remotely resemble traditional environmental contamination . . .’ ” Western Alliance Ins. Co. v Gill, supra 426 Mass, at 118. The court then cites numerous cases holding that the pollution exclusion did not bar coverage in a variety of contexts, including property damage caused by fumes released from muriatic acid used to etch a floor surface, Sargent Constr. Co. v. State Auto Ins. Co., 23 F.3d 1324, 1327 (8th Cir. 1994), and injuries incurred by a United States Department of Agriculture inspector when a gasket failed in a refrigeration system causing an ammonia leak, Ekleberry, Inc. v. Motorists Mut. Ins. Co., No 3-91-39, 1992 WL 168835 (Ohio Ct.App. July 17, 1992). Western Alliance Ins. Co. v. Gill, supra 426 Mass, at 119.
Finally, the court summarizes the “common thread between these decisions” as follows:
“all involve injuries resulting from eveiyday activities gone slightly, but not surprisingly, awry,” and in each, the insurer urged a broad reading of the pollution exclusion clause to cover the accident at issue. However, an objectively reasonable insured, reading the language of the typical pollution exclusion, would not expect a disclaimer of coverage for these types of mishaps even though they involve “discharges,” “dispersals,” “releases,” and “escapes” of “contaminants” and “irritants.”
Id. at 119-20.
In a footnote, the court in Gill distinguishes a case relied upon by defendant here, United States Liab. Ins. Co. v. Bourbeau 49 F.3d 786, 786-87 (1st Cir. 1995), in which the court held that the pollution exclusion precluded coverage for damage from lead paint chips contaminating the area where defendant had stripped and painted a building. The court in Gill notes, at 120 n.6:
The [Bourbeau] court distinguished McFadden, noting that “McFadden was not an environmental pollution case. McFadden concerned personal injuiy caused by the presence of lead paint in a household. This case concerns injuiy to property caused by the alleged negligent discharge of lead paint onto property. The latter is a classic example of ‘pollutiorithe discharging of a harmful substance onto landwhile the former is most demonstrably not. An objectively reasonable person simply would not ascribe the word ‘pollution’ to the presence of lead paint in a house.” [Bourbeau] at 789. (Emphasis original.) This case [i.e., Gü.1) could be distinguished for virtually the same reasons.
*174 For similar reasons, the present case can also be distinguished from Bourbeau. A substance can have polluting or contaminating effect but may also do damage in a way that no objectively reasonable person would describe as pollution or contamination; in other words, that a substance may be a pollutant or contaminant in some circumstances does not render it an excluded pollutant or contaminant in every circumstance. Instead, the cases teach that context is the key. Here, an objectively reasonable person would conclude not that the acid polluted or contaminated the water pipe, but that it acted to crack or break the pipe, with reasonably foreseeable damage resulting, just as (in the cases cited above and in Gilí) an objectively reasonable person would conclude that damage or injury caused by oven fumes, by fumes from acid used to etch flooring, or by a failed gasket causing an ammonia leak, did not, in those circumstances, constitute pollution or contamination.
Accordingly, in the present case the Court concludes that damage caused by water released as a result of the corrosive action of the ferric chloride on the water pipe is not excluded by the pollution exclusion. Similarly, any property damage to plaintiffs facility, and any alleged personal injury, resulting from water, ferric chloride mixed with water, or ferric chloride, spilled within plaintiffs facility, is not excluded: those events would be understood by a reasonably objective insured as more akin to “accidents arising during the course of normal business activities (even though] they involve a ‘discharge, dispersal, release or escape’ of an ‘irritant or contaminant. ..,’ ” than they are to “products or byproducts of industrial production that may cause environmental pollution or contamination . . .” Gill supra, at 118.
The escape of ferric chloride, or water mixed with ferric chloride, outside the building (i.e., to the catch basin/sewer system), on the other hand, would be understood by a reasonably objective insured as “a classic example of ‘pollution’the discharging of a harmful substance onto land . . .” Id. at 120, n. 6. Accordingly, that event comes within the pollution exclusion and is not covered.[2]
II. Negligent Work Exclusion
SEACO relies on the “negligent work” exclusion of the policy, which excludes “loss or damage caused by or resulting from . . . [flaulty, inadequate or defective:
(1) Planning, zoning, development, surveying siting;
(2) Design, specifications, workmanship, repair, construction, renovation, remodeling, grading, compaction;
(3) Materials used in repair, construction, renovation or remodeling; or
(4) Maintenance;
of part of all of any property on or off the described premises." Policy, Special Property Coverage Form, at B.3.c. Specifically, SEACO argues that the employee’s actions constituted faulty, inadequate or defective planning, workmanship, and maintenance. “Planning,” in the context of “zoning, development, surveying siting,” was not what the employee was engaged in. Nor is there any basis for concluding that he was performing “maintenance.” Similarly, he was not engaged in “workmanship,” because he was not engaged in the creation of Eastern’s product, etched metal; rather, as SEACO admits, the incident occurred when Eastern’s employee “left the building on June 2, 1998, without turning off two valves from an outside storage vessel containing ferric chloride and without turning off the pump.” SEACO’s “Response to Plaintiffs Statement of Undisputed Material Facts . . .” para. 24.
Accordingly, the negligent work exclusion does not exclude the claims in this case.[3]
III. Claim under G.L.c. 93A
Both parties seek summary judgment with regard to Count II (Eastern’s claims under G.L.c. 93A and c. 176D). Because I conclude that genuine issues of material fact remain as to those claims, the motions pertaining to Count II will be denied.
ORDER
For the reasons stated above, plaintiff Eastern Reproduction Corporation’s Motion for Partial Summary Judgment is ALLOWED with regard to liability under the policy issued by defendant SEACO Insurance Company, except as to claims for discharge of ferric chloride into the sewer system and/or catch basins outside Eastern’s premises, as to which the motion is DENIED. For the same reasons, defendant SEACO’s Motion for Partial Summary Judgment is ALLOWED as to liability for claims for discharge of ferric chloride into the sewer system and/or catch basins outside Eastern’s premises, and is otherwise DENIED.

See June 15, 1998 letter by Eastern’s consultant, Stephen A. Sakakeeny, of Capaccio Environmental Engineering, Inc. (Sakakeeny letter).

Eastern argues that, because the ferric chloride was contained in the sewer system, and would have been swept into that system for eventual treatment had it traveled farther, it did not contaminate or pollute land. Putting aside any evidence of or potential for seepage into soil beneath the catch basin, or into soil or groundwater through other cracks along the sewer system, and the manner in which that purportedly non-polluting event was handled by Clean Harbors, I conclude that the argument does not reflect the view that an objectively reasonable person would take of such a discharge.

SEACO’s arguments based on Bourbeau, supra, Jussim v. Massachusetts Bay Ins. Co., 415 Mass. 24 (1993), and Standard Electric Supply Company, Inc. v. Norfolk and Dedham Mutual Fire Insurance Company, 1 Mass.App.Ct. 762 (1973), do not change the Court’s conclusion.