EASTERN PRODUCTS CORPORATION & others[1] *vs.*
CONTINENTAL CASUALTY COMPANY & another.[2]

No. 01-P-91.

Essex. February 12, 2003. - May 5, 2003.

Present: CYPHER, MASON, & McHUGH, JJ.

*Insurance,* General liability insurance, Insurer's obligation to defend.
*Indemnity. Hazardous Materials. Notice,* Insurance claim. *Waiver.*

In an action against an insurer seeking a declaration that a policy issued by
the insurer obligated it to defend and indemnify the insureds in an
environmental liability suit brought against them, the judge properly al-
lowed summary judgment for the insurer, where the insureds had failed to
give timely notice of their claims to the insurer and the insurer satisfied its
burden under G. L. c. 175, § 112, of showing that it suffered actual
prejudice from the late notice, and where the insureds violated the voluntary
payment provision of their insurance contract. [20-26]

In an action against an insurer seeking a declaration that general liability,
personal umbrella, and multiperil policies issued by the insurer obligated it
to defend and indemnify the insureds in an environmental liability suit
brought against them, the judge properly allowed summary judgment for
the insurer with respect to the general liability policies, where the insureds
had failed to comply with the notice and voluntary payment provision of
the policies; with respect to the personal umbrella policy, where the insurer
produced evidence that no so-called "triggering policy" existed, and the
insureds failed to produce contrary evidence; and, with respect to the mul-
tiperil policy, where the insureds failed to produce any evidence that the
insurer in fact had issued any such policy, or indicated the terms of any
such policy. [26-28]

CIVIL ACTION commenced in the Superior Court Department on
December 8, 1997.

Motions for summary judgment were heard by *Thayer
Fremont-Smith,* J., and *Ralph D. Gants,* J.

*Robert A. Fasanella & Don Nagle* for the plaintiffs.

---

[1]Steven K. Feinberg, trustee of Ballardview Realty Trust, and Marjorie
Feinberg.

[2]Maryland Casualty Company.

*Robert M. Kaplan* for Continental Casualty Company.

*James Robert Hall* for Maryland Casualty Company.

MASON, J. The plaintiffs, Eastern Products Corporation (EPC), Steven Feinberg, trustee of Ballardview Realty Trust, and Marjorie Feinberg, commenced this action against Continental Casualty Company (Continental), Maryland Casualty Company (Maryland), and five other insurance companies,[3] seeking a declaration that various general liability and other insurance policies issued by the companies obligated them to defend and indemnify the plaintiffs in any environmental liability suit brought against them, either by a third party or by the Department of Environmental Protection (DEP),[4] and also damages for breach of contract and violation of G. L. c. 93A and 176D. On March 8, 2000, a Superior Court judge granted summary judgment to Maryland and dismissed the complaint against it on the grounds that the plaintiffs had failed to comply with the notice and voluntary payment provisions in the single policy issued by Maryland. On February 2, 2001, another Superior Court judge, expressly adopting the first judge's rulings of law, granted summary judgment to Continental and dismissed the complaint against it. We affirm the judgments.

*Facts.* We recite the pertinent facts shown from materials contained in the summary judgment record that were unmet by any countervailing materials. See Mass.R.Civ.P. 56(c), 365 Mass. 824 (1974); *Ng Bros. Constr., Inc.* v. *Cranney*, 436 Mass. 638, 644 (2002).

The plaintiff EPC was incorporated in 1973 and for many years operated a rubber manufacturing business on property consisting of approximately 5.4 acres of land with a processing facility at 18-20 Dale Street in Andover (property). EPC stockpiled used rubber products on the property and ground

---

[3]The appeal against First State Insurance Company, Federal Insurance Company, and the Hartford Insurance Company was voluntarily dismissed. We have previously upheld summary judgment in favor of two other defendants, Commercial Union Insurance Company and Merchants Mutual Insurance Company. See *Feinberg* v. *Commercial Union Ins. Co.*, 54 Mass. App. Ct. 587, 591-593 (2002).

[4]DEP is the successor agency to the Department of Environmental Quality Engineering. See St. 1989, c. 240, § 101; *Taygeta Corp.* v. *Varian Assocs.*, 436 Mass. 217, 219 n.3 (2002). We refer to DEP throughout this opinion.

them into rubber buffings and particles for use in the manufacture of rubber athletic surfaces and other materials. The property had been purchased in 1972 by Robert Feinberg (Robert), who was EPC's president and largest shareholder. Each of Robert's four sons, Arthur, James, Richard and the plaintiff Steven Feinberg (Steven), were also shareholders of EPC.

From September, 1977, through May 1, 1985, seven different fires occurred at the rubber stockpiles stored on the property. The fires burned between 5.6 and 6.5 million pounds of stockpiled rubber, along with an estimated one million pounds of rubber buffing dust. In early January, 1986, EPC commissioned Goldberg-Zoino & Associates (GZA) to perform an environmental survey of the property to determine whether a release of hazardous materials as defined in G. L. c. 21E, § 2, had occurred at the property. On January 27, 1986, GZA issued a report to EPC (sent to the attention of Robert) which stated that its testing had indicated that volatile organic compounds (VOCs) and volatile hydrocarbons were present in portions of the groundwaters at the site but that they did not pose a threat to public health or safety.

In June, 1986, Robert died and title to the property passed to his widow, the plaintiff Marjorie Feinberg (Marjorie). In December, 1987, Marjorie sold all of the property, except for the portion on which the processing facility occupied by EPC was located, to the Ballardview Realty Trust (BRT), a real estate trust beneficially owned by Steven and his brother James.[5]

In the meantime, EPC had notified DEP of the January, 1986, GZA environmental survey and report. A little over two years later, in October, 1988, DEP designated the property as a "location to be investigated," and directed EPC to undertake and submit a Phase I preliminary environmental site assessment of

---

[5]Prior to purchasing its portion of the property, BRT applied to the board of zoning appeals of Andover pursuant to G. L. c. 40B, §§ 20-23, for a comprehensive permit allowing the construction of a 139-unit housing project on the property. The board approved the permit but, due to the contamination on the property, reduced the number of allowable units below what BRT had requested. As a result, the project became economically unfeasible for BRT, but it still proceeded to acquire the portion of the property it had previously agreed to purchase.

the property.[6] EPC accordingly engaged Kurz Associates (Kurz) to perform such an assessment, and on March 16, 1990, Kurz issued a report concluding that total petroleum hydrocarbons in the ground water at the site exceeded the limits established in the Massachusetts Contingency Plan (MCP), 310 Code Mass. Regs. §§ 40.0000 et seq. (1995). The report further concluded that the property was a "disposal site" as defined in G. L. c. 21E.[7]

Thereafter, in October, 1991, BRT, acting on behalf of itself and Marjorie as the owner of the smaller portion of the property, and also on behalf of EPC as the operator on the property, applied to DEP for a waiver of the written approvals necessary under the MCP for remedial response actions with respect to the entire property.[8] As part of its application, BRT indicated that within five years of the approval of the application, it would conduct a Phase II comprehensive site assessment[9] of the property and then excavate all the contaminated sediments and treat the groundwaters at the site if the assessment determined that such actions were necessary. BRT further agreed that it would complete each of these remedial actions "in accordance

---

[6]A Phase I site assessment consists of "preliminary response actions and risk reduction measures, including a limited investigation and evaluation of the contaminated site and a remediation of sudden releases, imminent hazards, and other time-critical conditions." See *Taygeta Corp.* v. *Varian Associates, Inc.*, 436 Mass. at 224, citing 310 Code Mass. Regs. § 40.0400 (1995).

[7]Under G. L. c. 21E, § 2, a disposal site is "any structure, well, pit, pond, lagoon, impoundment, ditch, landfill or other place or area, excluding ambient air or surface water, where uncontrolled oil or hazardous material has come to be located as a result of any spilling, leaking, pouring, abandoning, emitting, emptying, discharging, injecting, escaping, leaching, dumping, discarding or otherwise disposing of such oil or hazardous material."

[8]Before 1993, the MCP allowed for potentially responsible parties of non-priority disposal sites to apply for such waivers. See 310 Code Mass. Regs. § 40.537 (1988).

[9]A Phase II assessment is "a comprehensive site assessment to collect, develop and evaluate the following information: (1) the source, nature, extent and potential impacts of the release of hazardous material; (2) the risk of harm to health, safety, public welfare, and the environment posed by the disposal site; and (3) the need for remedial actions . . . . [It] shall include, inter alia, a characterization of the sources, nature, and vertical and horizontal extent of contamination at the disposal site, and the identification and characterization of all potential human and environmental receptors that could be affected by hazardous material at or migrating from such site." See *Taygeta Corp.* v. *Varian Associates, Inc.*, *supra* at 224-225, citing 310 Code Mass. Regs. § 40.0833 (1993) and 310 Code Mass. Regs. § 40.0835(4)(f), (g) (1995).

with all applicable requirements of G. L. c. 21E and the Massachusetts Contingency Plan." Steven signed the waiver application on behalf of BRT and certified that he had personally examined the waiver and agreed to its terms.

DEP approved BRT's waiver application in April, 1992, and then, in July, 1992, it issued a determination that the property was a confirmed disposal site within the meaning of G. L. c. 21E, § 2. At or about this same time, EPC's operations at the site were discontinued and all of its correspondence and other business records, except for records pertaining to various insurance policies it had purchased, were destroyed or discarded.

In November, 1993, EPC and BRT for the first time sent letters to Maryland and Continental stating that they were asserting claims and demanding defenses under various policies the companies had issued based on the contamination that had occurred on the property. Maryland responded with a letter requesting further information while Continental responded with a letter stating that it would provide a defense to EPC for claims arising from the contamination but indicating that it was reserving its rights to deny coverage under its policies in the future. Following substantial additional correspondence between the parties, the plaintiffs commenced the present action in December, 1997.

1. *Summary judgment in favor of Maryland.* The sole Maryland policy at issue is a general liability policy which was issued to "Robert Feinberg c/o Eastern Warehouse Co.,"[10] and was effective for the period from January 19, 1977, through January 19, 1978. Maryland agreed in the policy to pay "on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of . . . property damage to which this insurance applies, caused by an occurrence," which was defined in the policy as "an accident, including continuous or repeated exposure to conditions, which results in . . . property damage neither expected nor intended from the standpoint of the insured." The policy further provided, however, that, in the event of an occurrence, the insured was

---

[10]Eastern Warehouse Co. apparently was a predecessor corporation to Eastern Products Corporation.

required to provide written notice of the occurrence to Maryland "as soon as practicable" and also that: "The insured shall not, except at his own cost, voluntarily make any payment, assume any obligation or incur any expense other than for first aid to others at the time of the accident."[11]

In allowing summary judgment for Maryland, the judge reasoned that the plaintiffs had failed to comply with the notice provision of the policy because they had waited more than seven years after obtaining the GZA report in 1986, at which time they knew or should have known of the contamination at the property, to provide any notice to Maryland of any occurrence. The judge determined that Maryland had been prejudiced by the delay because, during the interim, Robert and other potential witnesses with knowledge of the circumstances of the fires had died and all of EPC's business records had been destroyed. The judge further reasoned that the plaintiffs had also violated the voluntary payments provision of the policy by entering into an agreement with DEP in connection with the waiver application to perform all necessary response actions in compliance with G. L. c. 21E and the MCP.[12]

On appeal, the plaintiffs assert that the judge erred in determining that they had failed to provide timely notice of their claims to Maryland and that, in any event, Maryland did not satisfy its burden required by G. L. c. 175, § 112, to demonstrate that it suffered any prejudice as a result of any

---

[11]This quoted provision is appended to the cooperation provision of the policy. The section in full reads as follows: "The insured shall cooperate with the company and, upon the company's request, assist in making settlements, in the conduct of suits and in enforcing any right of contribution or indemnity against any person or organization who may be liable to the insured because of injury or damage with respect to which insurance is afforded under this policy; and the insured shall attend hearings and trials and assist in securing and giving evidence and obtaining the attendance of witnesses. The insured shall not, except at his own cost, voluntarily make any payment, assume any obligation or incur any expense other than for first aid to others at the time of the accident."

[12]The judge also reasoned that none of the plaintiffs were "insured persons" under the Maryland policy, but specifically noted that the meaning of the term as used in the policy was "not entirely free from doubt." Because we agree with the judge that the plaintiffs did not comply with the notice or voluntary payment provisions contained in the policy, we need not reach that issue.

such failure.[13] The plaintiffs further argue that the judge erred in concluding that each of them had violated the voluntary payments provision of the policy and, in any event, Maryland once again failed to show that it suffered any prejudice as a result of any such violation. We address each of these arguments in turn.

a. *Late notice.* The plaintiffs argue that their duty to notify Maryland of their claims under the policy did not arise until, at the earliest, July, 1992, because it was only then that DEP designated the property as a confirmed disposal site. The plaintiffs assert that, prior to that time, they had no knowledge or reason to believe that DEP would be asserting a claim against them with respect to the VOCs discovered in the groundwater at the property or that the contamination had been caused by the fires.

It is well-settled, however, that "the fact, that the insured has a reasonable and bona fide doubt as to the existence of any injury or of any liability, cannot be used to deprive the insurer of his contractual right to have an immediate notice of the occurrence of an accident, regardless of the damages that may be claimed to flow from that accident." *Segal* v. *Aetna Cas. & Sur. Co.*, 337 Mass. 185, 188 (1958), quoting from *McCarthy* v. *Rendle*, 230 Mass. 35, 39 (1918). This is because "the consequences of the insured's unilateral decision not to report an occurrence of an accident at the time it occurs (irrespective of any good faith belief as to the existence of any liability or injury) are to deny the insurer of the opportunity to investigate the cause and nature of a claim or occurrence while the facts are still fresh in the minds of the parties and while the physical evidence of the occurrence is still fresh." *Fireman's Fund Ins. Co.* v. *Valley Manufactured Prods. Co.*, 765 F. Supp. 1121, 1126 (D. Mass. 1991), citing *Powell* v. *Fireman's Fund Ins. Cos.*, 26 Mass. 508, 513 (1988).

Here, the plaintiffs do not dispute that they had actual knowledge of the fires occurring from September, 1977, through

---

[13]The statute, G. L. c. 175, § 112, provides: "An insurance company shall not deny insurance coverage [under a designated liability insurance policy] to an insured because of failure of an insured to seasonably notify an insurance of an occurrence . . . unless the insurance company has been prejudiced thereby."

May, 1985, and that the fires had burned several million pounds of rubber that was stockpiled on the property. Also, upon EPC's receipt of the GZA report in January, 1986, it knew at the level of its president that VOCs and volatile hydrocarbons were present in the groundwaters at the property. We agree with the judge that the plaintiffs' duty to notify Maryland of an occurrence arose at least at that time, because the plaintiffs were then aware or, upon reasonable inquiry, would have been aware both that contamination had occurred at the property and that the fires were a likely source of that contamination. See, e.g., *Commonwealth* v. *Olivo*, 369 Mass. 62, 69 (1975) (notice of facts which would incite person of reasonable prudence to inquiry is notice of all facts which a reasonably diligent inquiry would develop). See also *Demoulas* v. *Demoulas*, 428 Mass. 555, 577 (1998). It is irrelevant that the plaintiffs might have believed in good faith, based on the GZA report or otherwise, that the VOCs did not pose a threat to public health or safety or would not lead to a claim against it by DEP or some other third party. See *Powell* v. *Fireman's Fund Ins. Cos.*, *supra* at 514.

We also agree with the judge that Maryland satisfied its burden under G. L. c. 175, § 112, of showing that it suffered actual prejudice from the late notice.[14] The undisputed facts establish that Robert was president and largest shareholder of EPC throughout the relevant period; he was likely to have the most knowledge of the fires and of other possible causes for the contamination occurring at the site; and that Robert died in June, 1986, approximately six months after the plaintiffs' duty to provide notice to Maryland "as soon as practicable" had arisen.[15] It was also undisputed that in 1992, before the plaintiffs notified Maryland of any claims, EPC wound up its operations and, in connection with that winding up, destroyed all of its

---

[14]Maryland argues that G. L. c. 175, § 112, cannot apply to the plaintiffs' claims against it in this case because only the first fires were covered by its policy and these occurred before the statute became effective. See *Fireman's Fund Ins. Co.* v. *Valley Manufactured Prods. Co.*, *supra* at 1124. Once again, we need not reach that issue because we agree with the judge that Maryland showed that it suffered actual prejudice as a result of the plaintiffs' late notice to it.

[15]Arthur Feinberg testified at a deposition that it was Robert who was responsible for submitting claims to EPC's property insurers after one of the largest fires had occurred.

correspondence and business records.[16] The loss of these likely sources of critical information regarding the origins of the fires and other possible causes of the contamination existing at the property constituted prejudice to Maryland as matter of law. See *Darcy* v. *Hartford Ins. Co.*, 407 Mass. 481, 486 (1990) (loss of critical evidence or testimony from material witnesses was sufficient where insurer demonstrated its interests actually were harmed). See also *West Bay Exploration Co.* v. *AIG Specialty Agencies of Tex., Inc.*, 915 F.2d 1030, 1037 (6th Cir. 1990). Contrast *Employers' Liab. Assur. Corp., Ltd.* v. *Hoechst Celanese Corp.*, 43 Mass. App. Ct. 465, 476-477 (1997).

b. *Voluntary payments.* The plaintiffs also assert that the judge erred in concluding that each of them had violated the voluntary payments provision in the policy because it was only BRT which applied to DEP for a waiver of the written approvals necessary for remedial response actions and there was no indication in the record that BRT accepted the waiver ultimately approved by DEP. The plaintiffs further argue that even if they did violate the voluntary payments provision, Maryland should be barred from relying on that provision as a basis for avoiding liability under the policy because it cannot show that it was prejudiced by the violation.

In fact, Steven stated in an affidavit submitted in the Superior Court that, at the time he submitted the waiver application to DEP, he was acting for Marjorie and EPC, as well as for BRT. More specifically, Steven stated in his affidavit that BRT hired an environmental engineering company, known as IEP, Inc., to submit a waiver application to the DEP. He further stated that he was advised by the DEP that it would not grant the waiver unless the trust agreed to include the EPC building in its defined waiver site. Accordingly, BRT agreed to include the remaining property of EPC in its waiver request, even though it had no ownership interest in the facility. Finally, he asserted that through these actions, BRT managed real estate concerns that normally would have been borne by the operator of the site, EPC, or by its title owner, Marjorie Feinberg.

On the basis of this affidavit, the plaintiffs argued in the

---

[16]We note that Steven testified at a deposition that these records were substantial, and filled up most of a thirty-yard dumpster.

Superior Court that because BRT had acted as property manager for EPC both before and after it had purchased its portion of the property, BRT was an insured entity under Maryland's policy. More specifically, the plaintiffs argued that Steven K. Feinberg, as trustee, handled EPC's property management problems alleged by the Andover board of health in 1987; undertook and financed the environmental assessment of the entire property including the DEP waiver process; and performed all indicative real estate management on behalf of BRT and EPC. Thus, BRT argued it was an additional insured under the Maryland policy.

Having themselves asserted in the Superior Court that BRT was acting for EPC and Marjorie, as well as for itself, in submitting the waiver application to DEP, the plaintiffs cannot now assert that the judge erred in finding this as an undisputed fact, and thereby concluding that EPC and Marjorie had entered into the waiver agreement to the same extent as if they had signed the agreement. See *Nalbandian* v. *Hanson Restaurant & Lounge, Inc.*, 369 Mass. 150, 156 (1975) (undisclosed principal is liable on agreement entered into for his benefit). Plaintiffs' arguments would result in a mockery of the rules on summary judgment, and defeat their very purpose.[17] See *Manganaro Drywall, Inc.* v. *Penn-Simon Constr. Co.*, 357 Mass. 653, 659 (1970).

The plaintiffs' further assertion that there was no indication in the summary judgment record that BRT itself had accepted the waiver ultimately approved by DEP is equally insubstantial. Steven testified at a deposition that he was "almost certain" that he signed the form included with the approval indicating that BRT was accepting the approval together with its stated conditions. The plaintiffs never submitted any contrary evidence and, indeed, never argued in the Superior Court that BRT had not entered into the waiver agreement. They are once again barred from doing so here.

Finally, in *Augat, Inc.* v. *Liberty Mut. Ins. Co.*, 410 Mass. 117, 123 (1991), the Supreme Judicial Court explicitly held that

---

[17]We reject the plaintiffs' contention that BRT could not have been acting for EPC at the time it submitted the waiver application because EPC had dissolved as a corporation on December 31, 1990. Notwithstanding EPC's formal dissolution in December 31, 1990, EPC continued in existence for an additional three-year period for the purposes of winding up its affairs. See G. L. c. 156B, § 102.

prejudice would be presumed in a case such as this where, prior to giving notice to its insurer, an insured had entered into an agreement with the Commonwealth to clean up a site at its own expense. We reached a similar result in *Atlas Tack Corp.* v. *Liberty Mut. Ins. Co.,* 48 Mass. App. Ct. 378, 386 (1999). Contrary to the plaintiffs' suggestion, we do not think that those decisions are inapplicable here merely because they involved consent judgments rather than an agreement entered into before any litigation had commenced. Here, just as in these prior cases, the plaintiffs entered into a binding agreement with the Commonwealth to clean up the property at their own expense, and thereby caused prejudice to Maryland's interests as matter of law. We therefore conclude that the judge did not err in granting summary judgment in Maryland's favor both because the plaintiffs had failed to give timely notice to Maryland and also because they violated the voluntary payment provision of the insurance contract.

2. *Summary judgment in favor of Continental.* Continental issued one general liability policy (no. CAP9419187) to Robert, effective for the period from October 1, 1973, to October 1, 1976, and two additional general liability policies (nos. CCP2440203 and CCP3308582) to EPC, effective for the periods from January 1, 1976, to January 1, 1977, and from January 1, 1977 to January 1, 1980) (general liability policies). Additionally, Continental issued a personal umbrella policy (no. UP1793434) to Robert, effective for the period from December 27, 1974, to December 27, 1977 (excess policy). The plaintiffs alleged that Continental had also issued a multiperil insurance policy (no. 2761020) to EPC, effective as of 1976 (multiperil policy), but could not produce a copy of the policy or documents showing its terms.

Because the general liability policies issued by Continental had precisely the same notice and voluntary payment provisions as the Maryland policy, we agree with Continental that the judge properly allowed summary judgment in its favor with respect to those policies. The plaintiffs have advanced no substantial basis, and we can discern none, for reaching a differ-

ent result with respect to the general liability policies that Continental issued first to Robert and then to EPC.[18]

The situation is different, however, with respect to the personal umbrella policy. In contrast to the Maryland and Continental general liability policies, the personal umbrella policy contained a notice provision which was tied, not to occurrence, but to the insured obtaining information or forming an opinion that a claim would implicate the excess layer.[19] It also contained a general assistance and cooperation clause which omitted any statement about voluntary payments by the insured. The record does not establish that Continental made any showing that the plaintiffs failed to comply with either of these substantially different provisions contained in the excess policy. See *Employers' Liab. Assur. Corp., Ltd.* v. *Hoechst Celanese Corp.*, 43 Mass. App. Ct. at 472-476.

Nevertheless, the personal umbrella policy contained a provision stating that it would not apply:

> "to any business pursuits or business property (other than farms) of an Insured except to the extent that insurance therefor is provided by an underlying policy listed in the Schedule of Underlying Insurance . . . ."

While the schedule of underlying insurance attached to the personal umbrella policy referred to a "general liability" policy issued by "Hartford" with a limit of $100,000 "per occur-

---

[18]We reject the plaintiffs' argument that the judge was precluded from allowing summary judgment in favor of Continental with respect to the general liability policies merely because a different judge had denied an earlier motion Continental had filed for summary judgment. Continental's earlier motion had asserted different grounds in support of summary judgment and, in any event, it is well settled that a judge has discretion to consider a new motion for summary judgment at any time prior to trial. See *King* v. *Globe Newspaper Co.*, 400 Mass. 705, 707-708 (1987), cert. denied, 485 U.S. 940, 962 (1988), and cases cited.

[19]The notice provision in the excess policy provided only: "Whenever the Insured has information from which the Insured may reasonably conclude that an occurrence covered hereunder involved injuries or damages which, in the event the Insured should be held liable, is likely to involve this policy, notice shall be sent to the Company as soon as practicable, provided however that failure to notify the Company . . . of any occurrence which at the time of its happening did not appear to involve this policy, but which at a later date would appear to give rise to claims hereunder, shall not prejudice such claims."

rence,"[20] the plaintiffs did not produce a copy of any such policy providing coverage for Robert's "business pursuits" or "business property," as distinct from his home or other real estate he owned. In support of its motion, Continental produced evidence that, before the litigation began, the plaintiffs had submitted a Hartford policy to it, which they identified as the policy referred to in the schedule but which did not provide any coverage for Robert's business pursuits or business property. In these circumstances, where Continental produced evidence that no triggering policy existed, and where the plaintiffs failed to produce any contrary evidence, Continental was entitled to summary judgment dismissing the plaintiffs' claims with respect to the personal umbrella policy.[21] See *Kourouvacilis* v. *General Motors Corp.*, 410 Mass. 706, 711-712 (1991). Contrast *Employers' Liab. Assur. Corp., Ltd.* v. *Hoechst Celanese Corp., supra* at 483-484.

Likewise, while the plaintiffs alleged in their amended complaint that Continental had issued a multiperil insurance policy to EPC effective as of 1976, they failed to produce any evidence that Continental in fact had issued any such policy to EPC or indicating the terms of any such policy. Continental, therefore, was entitled to summary judgment dismissing the plaintiffs' claims with respect to the alleged multiperil policy as well.

*Judgments affirmed.*

---

[20]The schedule also referred to an automobile liability policy issued by Merchants Mutual Insurance Company with limits of $100,000 for each person and $300,000 for each occurrence.

[21]We recognize that the judge did not rely on the plaintiffs' failure to produce any evidence that the Hartford policy listed on the schedule attached to the personal umbrella policy provided coverage for business pursuits or business property as a ground for dismissing the plaintiffs' claims with respect to the policy. An appellate court, however, may uphold a correct ruling by a trial court on a ground different from that relied on by the trial court. See *Kelly* v. *Avon Tape, Inc.*, 417 Mass. 587, 590 (1994).