Fabricant, Judith, J.
This action presents a dispute over insurance coverage for liability for environmental damage. The insured, plaintiff UniFirst Corporation (UniFirst), seeks declaratory judgment and damages against its insurer, defendant Liberty Mutual Insurance Company (Liberty Mutual). The matter is before the Court on Liberty Mutual’s motion for summary judgment and UniFirst’s motion for partial summary judgment, along with related motions to strike. For the reasons that will be explained, both parties’ summary judgment motions will be denied.
BACKGROUND
The record before the Court establishes the following background relevant to the present motions.[1]
1. Ownership of and Operations at the Site.
From September 30, 1976, until September 27, 1985, UniFirst, through its subsidiary, Superior Products & Equipment Co., Inc. (Superior) operated a dry cleaning chemical and laundry supply and distribution center at 50Tufts Street, Somerville (the site). The building consisted of a long warehouse running north to south, with loading docks at each end. As part of its operation, Superior received deliveries, and delivered to customers, quantities of three chlorinated solvents: perchloroethylene/tetrachloroethene (PCE), trichloro-ethylene (TCE), and 1,1,1-trichloroethane (TCA). These products were delivered to the site in tanker trucks, which parked parallel to the building at the north end. Superior’s employees, including Richard Papa and Arthur Boyden, would connect a hose to a pipe located outside the building, and siphon the product from the tanker truck into a storage tank located inside the building. From there, Superior delivered product to its customers, by either of two means. In some instances, Superior would use trucks it owned or leased, with tanks; the trucks parked at the north loading dock, where Superior’s employees would siphon the product from the storage tank to tanks on the truck by means of a connector leading to a hose on a reel and equipped with a nozzle. Meters on the trucks measured the amount of product transferred, which ranged from 150 gallons to 650 gallons. In other instances Superior would deliver filled drums to customers, who would store the drums at their facilities. In those cases, empty drums were placed on pallets on the site for filling. After the drums were filled, Superior would use forklifts to move the pallets to the south loading dock, where the filled drums would be placed in Superior’s trucks for delivery.
The parties offer conflicting evidence as to the occurrence of releases and discharges during UniFirst’s operations. Papa, who worked as a general laborer between 1978 and 1980, and Boyden, who worked as a driver between 1978 and 1981, gave deposition testimony describing Superior’s operations as involving routine, frequent discharges of small quantities of product onto the ground, including deliberate spraying to kill weeds.[2] Papa and Boyden both also testified to certain events in 1980 involving larger discharges. On one such occasion, as described in the testimony of both Papa and Boyden, a pipe underneath a truck broke, resulting in a spill of 600 to 650 gallons of PCE onto the floor of the one of the bays of the south loading dock. Boyden, according to his testimony, drove the truck outside onto the grass next to the asphalt, and employees squeegeed the PCE out of the loading dock and onto the driveway, where it flowed down the street.[3] In addition, according to Boyden’s testimony, on at least three occasions a forklift pierced filled 55-gallon drums as they were being loaded onto trucks for delivery.[4]
In response to this testimony, UniFirst offers affidavits of two former employees, Edward Driscoll, who worked for Superior and its predecessor from 1968 until 1986 and served as operations manager, and Frank Wiley, who worked for Superior from 1978 until 1989 as a warehouse employee and truck driver, reporting to Driscoll.[5] Both contradict the testimony of Papa and Boyden regarding routine small discharges, insisting that UniFirst took careful precautions to prevent spills, and never deliberately sprayed or discharged product. Both deny any memoiy of drums being punctured. Driscoll reports that on one occasion, the timing of which he does not identify, “a nozzle physically detached from the hose, resulting in the accidental release of several gallons of PCE, which saturated my clothes.” That spill, he reports, occurred on cement, not on bare ground. He goes on, “there may have been one or two other minor spills during my employment, but spills were quite rare.” On another occasion, the timing of which he does not identify, Driscoll reports that a spill of some 1,500 gallons of TCE “resulted from one of the employees failing to close the valve connected to the storage tank.” That spill, he reports, “left a large stain on the pavement just outside the garage door” at the north end of the property; he identifies its location on a diagram. Wiley, in his affidavit, reports that, in around 1980, upon returning to the site after a trip, he observed that a tank that had been nearly full before he left had become depleted, and that a large stain was present on the pavement outside the garage doors at the north end of the building. Based on his own inventories before and after, Wiley estimates the amount released at 2,000 gallons.[6] In his estimation, discharge of the entire contents of the tank would take between five and thirty minutes. Driscoll, upon inquiiy, informed him that the spill had occurred as a result of employees leaving a valve open.[7]
*88 In 1985, Superior sold substantially all of its assets, other than the site, to John Danais Co., Inc. (Danais), and thereafter leased the site to Danais, which continued to operate the business as 50 Tufts St., Inc. In 2002, Superior sold the site to Danais. In 2005, Danais filed for bankruptcy, and its mortgage-holder took title to the site under the name Somerville Two, LLC (Somerville Two).
2.Claims of Contamination and Response.
In 2002 a potential buyer of the property conducted an environmental investigation, which revealed elevated levels of PCE in soil and groundwater at the site. By letter dated July 22, 2003, Danais demanded that UniFirst address the contamination. On October 29, 2003, the Massachusetts Department of Environmental Protection (DEP) sent a Notice of Responsibility (NOR) to Danais; Danais responded by notifying DEP of its bankruptcy. On November 16, 2004, UniFirst retained GEI Consultants (GEI) to evaluate conditions at the site. On November 9, 2005, DEP issued an NOR to UniFirst, identifying UniFirst as a Potentially Responsible Party (PRP) under G.L.c. 2 IE and regulations thereunder, known as the Massachusetts Contingency Plan (the 2005 NOR). The NOR instructed UniFirst to take specified actions to evaluate and remedy the site, on pain of enforcement action, which could include civil and criminal prosecution, multiple damages, penalties, and the like.
UniFirst responded with an Immediate Response Action Plan, identifying its Licensed Site Professional (LSP) and agreeing to undertake specified actions as directed. Between February 2006, and March 2007, GEI, on behalf of UniFirst, conducted air, soil and groundwater sampling on the site and at adjacent property, and installed a Sub-Slab Depressurization System to address indoor air concerns. On March 20, 2007, UniFirst tendered the 2005 NOR to Liberty Mutual, which agreed to defend under a reservation of rights.[8]
In 2008, Somerville Two filed suit against UniFirst, seeking damages for amounts it claimed it had spent on assessing, removing, and containing hazardous materials on the site, as well as diminution of the value of the property. UniFirst tendered the Somerville Two complaint to Liberty Mutual on September 23, 2008. Liberty Mutual again agreed to defend under a reservation of rights.[9] On January 27, 2009, DEP issued a second NOR to UniFirst (the 2009 NOR), indicating that PCE had been detected in a storm drainage catch basin at an intersection near the site. By letter dated February 27, 2009, Liberty Mutual agreed to defend the 2009 NOR under a reservation of rights.[10]
3.The Policies.
Between January 1, 1976 and September 1, 1987, Liberty Mutual issued three types of insurance policies to UniFirst; commercial general liability (GL) policies, excess liability policies, and motor vehicle/business automobile policies. The GL policies issued between January 1, 1976, and September 1, 1985, the excess policies issued between January 1, 1976, and January 1, 1979, and the automobile policies issued between 1984 and 1989 all include a pollution exclusion, with an exception for damage arising from a “sudden and accidental” release or discharge. The GL policy for September 1, 1985, to September 1, 1986, includes a pollution exclusion without that exception, but with an exception for damage arising from a release or discharge that “originates away from the premises owned by, rented or loaned to the named insured.” The GL policies for September 1, 1986 through October 1, 1989, and the excess policies in effect from September 1, 1985 through October 1, 1989, provide that the policy does not apply:
(1) to bodily injury or property damage arising out of the actual, alleged or threatened discharge, dispersal, release or escape of pollutants:
(a) at or from premises owned, rented or occupied by the named insured:
(2) to any loss, cost or expense arising out of any governmental direction or request that the named insured test for, monitor, clean up, remove, contain treat, detoxify or neutralize pollutants.
The automobile policies for January 1, 1976, through September 1, 1984, cover liability for property damage “caused by accident and arising out of the ownership, maintenance or use, including loading or unloading, of the insured motor vehicle.” The automobile policies for September 1, 1984, to October 1, 1989, cover liability for property damage “caused by an accident and resulting from the ownership, maintenance or use of a covered auto.” The automobile policies in effect prior to 1980 covered vehicles listed on a schedule of insured vehicles. Subsequent policies covered any vehicle owned or leased by UniFirst.[11]
All of the GL and automobile policies provide that the insured “shall not, except at [its] own cost, voluntarily make any payment, assume any obligation or incur any expense,” subject to specified exceptions not relevant here.
4.The Dispute.
As indicated supra, in response to UniFirst’s tenders, Liberty Mutual agreed to defend the two NORs and the Somerville Two suit, each under a reservation of rights. Pursuant to those agreements, Liberty Mutual has reimbursed UniFirst some $3.7 million for expenditures UniFirst categorizes as defense costs, including payments to Goodwin, Proctor LLP for legal services, and payments to GEI and other consultants for evaluation and other services. UniFirst nevertheless contends that Liberty Mutual has breached its obligations under the policies, in that it has not reimbursed UniFirst for an additional $7.2 million that UniFirst contends it has paid for legal and consulting services. On that basis, UniFirst filed this action on July 28, 2008. Its Second Amended Complaint, filed February 9, 2009, seeks declaratory relief with respect to Liberty Mutual’s duty to defend and indemnify (counts III and IV), along with damages for breach of the contractual *89 obligations of defense and indemnification (counts I and II), and breach of the duty of good faith and fair dealing and violation of c. 93A and c. 176D (count V). Liberty Mutual responds that it has no obligations, because UniFirst made payments and assumed obligations voluntarily, without Liberty Mutual’s consent, and because the liabilities in issue fall outside the coverage of any of the policies. Liberty Mutual has moved for summaiy judgment on all counts; UniFirst has responded with a motion for partial summaiy judgment as to count III of its complaint, which seeks declaration as to Liberty Mutual’s duty to defend. UniFirst also asks the court to rule on the correct standard for determining the reasonableness of its defense costs.
DISCUSSION 1. Voluntary Payment.
As set forth supra, each of the policies prohibits the insured from making any voluntary payment, assuming any obligation, or incurring any expense, except at its own cost. Liberty Mutual contends that all of the actions UniFirst took in response to the two NORs were voluntary. On that basis, Liberty Mutual argues that it is absolved of any responsibility for defense or indemnification with respect to the two NORs. UniFirst responds that it acted only in response to the compulsion of orders issued by DEP, and further, that Liberty Mutual has shown no prejudice resulting from UniFirst’s actions.
The voluntary payment provisions of the policies are among a set of provisions that courts have recognized as serving to enable the insurer to protect its interests. See Augat v. Liberty Mutual Ins. Co., 410 Mass. 117, 123 (1991); Darcy v. Harford Ins. Co., 407 Mass. 481, 490 (1990). In general, courts have permitted insurers to disclaim coverage based on breach of such provisions only upon a showing that the breach has actually prejudiced the insurer’s ability to protect its interests. See Sarnafil Inc. v. Peerless Ins. Co., 418 Mass. 295, 305 (1994); Augat, 410 Mass. at 123; Darcy, 407 Mass. at 490; Atlas Tack Corp. v. Liberty Mutual Ins. Co., 48 Mass.App.Ct. 378, 383 (1999).
Citing Augat supra, Liberty Mutual contends that a showing of actual prejudice is not required in case of a breach of a voluntary payment provision. The insured in Augat, upon being notified of an impending suit by the Commonwealth for environmental damage, executed a consent judgment, which entered simultaneously with the Commonwealth’s filing of its complaint. 410 Mass. at 118. The Supreme Judicial Court, referring to its histoiy of decisions requiring actual prejudice for an insurer to disclaim coverage based on an insured’s breach of policy provisions intended “to give the insurer an opportunity to protect its interests,” observed that the voluntary payment provision serves the same purpose. Id. at 123. On the particular facts presented, however, the Court determined that “the record clearly establishes that Augat’s breach of the voluntary payment provision undermined that purpose.” Id. On that basis, the Court concluded, “no showing of prejudice is required.” Id.[12] Contrary to Liberty Mutual’s contention, Augat does not establish a general rule that prejudice is unnecessary to disclaim coverage based on voluntary payment. Rather, as this Court reads the decision, Augat merely recognized that on the unusual facts of that case, prejudice was plain and indisputable, without the need of any further showng.[13]
This case does not involve any consent judgment, through which a litigant waives all opportunity to defend, and voluntarily incurs obligations subject to judicial enforcement. Here, rather, DEP issued administrative orders that, in themselves, imposed legal obligations, such that failure to comply would risk severe consequences. See, e.g., Hazen Paper Co. v. United States Fidelity and Guar. Co., 407 Mass. 689, 695-97 (1990). In the face of those orders, UniFirst responded as directed. Even if such response may fairly be characterized as voluntary—a point open to debate—the facts do not in themselves establish prejudice as a matter of law as in Augat. Liberty Mutual therefore is not entitled to summaiy judgment based on the voluntary payment provision.[14]
2. The Pollution Exclusions.
Liberty Mutual contends that it is entitled to summaiy judgment because the undisputed facts establish that coverage is barred under the pollution exclusions. As recited supra, the GL policies for periods between 1976 and 1985, and excess policies for 1976 through 1979, bar coverage for damage arising from release of contaminants, unless such release is “sudden and accidental.” Thus, to obtain coverage under any of these policies, UniFirst would have to prove that the damage, or some appreciable part of it, resulted from “sudden and accidental” releases. See Highlands Ins. Co. v. Aerovox, Inc., 424 Mass. 226, 231 (1997).
“When used in describing a release of pollutants, ‘sudden’ in conjunction with ‘accidental’ has a temporal element ... If the release was abrupt and also accidental, there is coverage for an occurrence arising out of the discharge of pollutants.” Lumbermens Mut. Cas. v. Belleville Indus., 407 Mass. 675, 680 (2009); see also Liberty Mut. Ins. Co. v. SCA Servs., Inc., 412 Mass. 330, 335-36 (1992). The insured need not prove that the abrupt release was the sole cause of the contamination. To survive summaiy judgment, however, it must “raise a factual issue as to whether the sudden and accidental release caused an appreciable amount of the damage for which it is being held liable.” Aerovox, 424 Mass. at 233-34.
Liberty Mutual contends that the record establishes that UniFirst will be unable to meet its burden. To address this argument, the Court must first consider Liberty Mutual’s motions to strike portions of the Driscoll, Wiley, and Ash affidavits. Liberty Mutual argues first that the Court should reject the Driscoll and Wiley affidavits because they contradict deposition testimony of Papa and Boyden, on which UniFirst *90 relies for certain factual assertions. This point, in the Court’s view, merely identifies inconsistencies in UniFirst’s position. Such inconsistences will provide ground for cross-examination and argument at trial, but do not support exclusion of the affidavits.[15]
The more substantial ground asserted in Liberty Mutual’s motion to strike is that portions of the Driscoll and Wiley affidavits appear to be hearsay or conclusions not based on personal knowledge. Having reviewed the affidavits carefully, with attention to the requirement that they demonstrate the witness’s competence to testify to the facts stated, see Mass.RCiv.P. 56(e), the Court agrees that the following portions of the affidavit are inadmissable: In the Wiley affidavit, paragraph 17, the first sentence of paragraph 18, paragraph 19, and the word “accidentally” in paragraph 20[16] in the Driscoll affidavit, the third sentence of paragraph 19.[17] The Court will allow the motion to strike with respect to those portions, and otherwise deny it.[18]
Thus, the record before the Court with respect to the timing and manner of releases causing the contamination consists, in substance, of the following. Papa and Boyden describe frequent, routine, small releases, some of which may have been deliberate, or at least tolerated as inherent in Superior’s operating practices. Driscoll and Wiley assert that they were present during the same period and generally in a position to observe, that they did not observe routine releases of the sort described by Papa and Boyden, and that the company conducted itself in such a way as to prevent such releases. Papa and Boyden also describe the so-called south and middle releases, the former caused originally by a broken pipe but then apparently exacerbated by intentional conduct, and the latter caused by multiple incidents of drums being punctured during the loading process. Driscoll and Wiley, in turn, deny the occurrence of these events, but, in combination, provide evidence from which ajury could infer that a large spill occurred in 1980, over the course of not more than a day, at á location in the north area of the facility where trucks were loaded. The results recounted by Ash tend to corroborate the occurrence of such an event.
A juiy presented with this body of evidence could come to any of a number of conclusions on the question of whether an appreciable part of the damage did or did not result from one or more sudden and accidental releases. A jury could accept the overall description of Superior’s operations provided by Papa and Boyden; either reject their descriptions of the south and middle releases, or view those events, in the context of the overall operations, as merely part of a routinely careless and pollution-prone operation; and either reject Driscoll’s and Wiley’s testimony, or find it insufficient to establish either the occurrence of any sudden and accidental event, or that any such event contributed appreciably to the overall contamination. On that basis, a jury could conclude that the evidence does not support coverage under the sudden and accidental exception to the pollution exclusions.
Alternatively, a jury could accept the testimony of Wiley and Driscoll, and either reject that of Papa and Boyden entirely, or reject it except with respect to the south and middle releases, and find those to be sudden and accidental. On that basis, a jury could also find that a substantial release occurred at the north loading dock in 1980 that caused an appreciable part of the contamination, and that in light of UniFirst’s overall operations and practices, despite the absence of direct evidence of the manner in which it occurred, it must have been sudden and accidental.[19] On that basis, a jury could find that UniFirst’s liability arises, at least in appreciable part, from sudden and accidental releases in 1980,[20] so that the policies for that and subsequent years that have the “sudden and accidental” exception to the pollution exclusion would cover.[21] The issue of coverage under these policies therefore depends on genuine disputes of material fact that must be resolved at trial.
The Court reaches a different conclusion with respect to the policies that have broader pollution exclusions. The 1985-86 policy exempts only damage from discharges originating away from property owned by the insured. Nothing in the record suggests that either the NORs or the Somerville Two claims arise from any discharges originating anywhere other than the site, or from discharges at the site after Superior ceased to own it. The 1986-1989 GL policies, and the 1985-1989 excess policies, all bar coverage both for damage from discharges at property owned by the insured, and also for costs arising from government-ordered response. These provisions, in combination, unlike the provisions discussed in Clean Harbors Envtl Servs., Inc. v. Boston Basement Technologies, 75 Mass.App.Ct. 709, 713-14 (2009), do not leave open coverage for liability on common-law theories or for natural resource damages. Nevertheless, the factual dispute with respect to the policies that do not include these broad pollution exclusions precludes summary judgment.
3. The Automobile Policies.
As recited supra, the automobile policies in effect throughout the relevant period covered damages caused by “accident” and arising from or resulting from “ownership, maintenance or use” of a covered automobile. The policies in effect between 1976 and 1984 specifically included “loading and unloading” within “use” of automobiles. Despite this language, Liberty Mutual argues that it is entitled to summary judgment declaring the absence of coverage under the automobile policies. It contends that UniFirst will be unable to meet its burden to show any of three facts necessary for coverage: that the releases occurred in connection with the “ownership, maintenance or use” of automobiles; that they occurred by accident; and that the automobiles involved were covered under the policies.
Having reviewed the record carefully, the Court is not persuaded that Liberty Mutual has demonstrated *91 the absence of a genuine dispute of material fact on any of these issues. The record provides evidence that at least some of the releases, and particularly the larger ones, occurred in connection with loading and unloading product to and from trucks. That activity constituted the “use” of automobiles. See generally Home Assurance Co. v. First Specialty Ins. Corp., 73 Mass.App.Ct. 1, 4 (2008). The discussion supra with respect to the issue of whether the releases were “sudden and accidental” necessarily encompasses the question of accident; the same evidence that could support a finding that some releases were sudden and accidental would necessarily support a finding that at least those releases were accidental.[22] As to the status of the trucks used in Superior’s operations, the Driscoll and Wiley affidavits provide evidence that all were either owned or leased by Superior, and that those used prior to 1980 were listed on the policy schedules. This evidence precludes summary judgment as to coverage under the automobile policies.
4. The G.L.c. 93A claim.
UniFirst claims that Liberty Mutual has violated G.L.c. 93A by unreasonably delaying payment for defense costs, and by tendering payment for attorneys fees based on hourly rates substantially lower than those reasonably incurred by UniFirst for its chosen counsel. See Watts Water Technologies, Inc. v. Fireman’s Fund Ins. Co., 22 Mass. L. Rptr. 659; 2007 WL 2083769 at *9 (Mass.Super. July 11, 2007) (insurer who funds defense under reservation of rights must pay “the full amount of reasonable attorneys fees incurred" for the insured’s chosen counsel). Liberty Mutual disputes these contentions, arguing that it has paid reasonably promptly, in light of the necessity for evaluation of complex billing by counsel and multiple consultants; that UniFirst has delayed in providing requested information; and that the amounts paid are reasonable in context, particularly in light of prior dealings between the parties, in which Liberty Mutual succeeded in negotiating lower rates with Goodwin, Proctor for representation of UniFirst in connection with an environmental claim. As this description of the parties’ positions makes plain, the disagreement centers on reasonableness, which is inherently a question of fact. The Court cannot resolve this issue on summary j udgment.
5. UniFirst’s Motion for Partial Summary Judgment.
UniFirst moves for partial summary judgment as to count III of its complaint, seeking a declaration that Liberty Mutual has a duty to defend it with respect to the two NORs and the Somerville Two action. Liberty Mutual responds that no declaratory judgment is necessary or warranted, because Liberty Mutual agrees that it has a duty to defend until such time as it might obtain a judicial determination of non-coverage, and in fact it has accepted responsibility to defend ever since it received notice of the first NOR.[23] The Court agrees.[24] Liberty Mutual’s references in its correspondence to its non-waiver of a hypothetical right to recoup payments merely protect it against the possibility that the bills it receives from UniFirst as purported defense costs may turn out, after payment, to be more properly classified as indemnification. Such reservations do not create an actual controversy where none otherwise exists.
UniFirst also seeks a ruling as to the standard Liberty Mutual must apply in reimbursing UniFirst for defense costs. Here too, the papers reveal the absence of any actual dispute on the point. The parties agree that, having accepted responsibility for defense under a reservation of rights, Liberty Mutual is obligated to reimburse UniFirst for all defense costs reasonably incurred. With respect to attorneys fees, reasonableness is determined according to the factors set forth in Linthicum v. Archambault, 379 Mass. 381, 388-89 (1979); see also Heller v. Silverbranch Constr. Corp., 376 Mass. 621, 628-29 (1978).[25] Where a dispute arises over the reasonableness of amounts incurred, the burden of proof is on the party seeking reimbursement. See Society of Jesus of New England v. Boston Landmarks Comm’n, 411 Mass. 754, 759 (1992). UniFirst does not contend that the present record establishes as undisputed the reasonableness of the amounts it seeks. Summary judgment is not appropriate.
CONCLUSION AND ORDER
Defendant Liberty Mutual Insurance Company’s Motion for Summary Judgment is DENIED. Plaintiff UniF-irst Corporation’s Motion for Partial Summary Judgment is DENIED. Defendant Liberty Mutual Insurance Company’s Motion to Strike UniFirst’s Improper Responses to Liberty Mutual’s Undisputed Material Facts and Deem Such Facts Admitted is DENIED. Defendant Liberty Mutual Insurance Company’s Motion to Strike Those Paragraphs in the Driscoll, Wiley and Ash Affidavits that are Based on Inadmissible Hearsay or not Based on personal Knowledge and to Disregard those Paragraphs of Such Affidavits that are Either Irrelevant or Conclusory is ALLOWED in part and DENIED in part, as stated herein. Plaintiffs Motion to Strike Extrinsic Evidence is DENIED. The clerk is directed to schedule a status conference before the undersigned at the earliest available date.

The 122-page statement of facts submitted by the parties pursuant to Superior Court Rule 9A(b)(5) has been singularly unhelpful to the Court; it has complicated the Court’s task, and thereby protracted the process of decision on the motions. The fault is mostly, but not entirely, that of plaintiffs counsel, who has inserted into the statement voluminous argument, which belongs only in memoranda of law, along with repeated meaningless qualifying language (to the effect that the policies referred to are only the ones located to date, and there may be others; that plaintiff disputes that quoted language “is a fair summary of all policy language applicable to matters at issue in this motion”; and the like). The ftrnction of a statement of facts under the rule is to assist the Court in identifying the facts that are or are not genuinely in dispute, and as to the latter, locating the evidentiary material that establishes the existence of a dispute. That is its only function. It is not an opportunity to circumvent the page limit on *92 memoranda of law, which, in this instance, the Court quite generously expanded, nor should it be used as an occasion to obfuscate by means of sheer volume. The Court declines to strike the plaintiffs’ responses, as the defendant has requested. But the Court has disregarded all argumentative material in the statement, along with language included by both sides that tends to characterize the terms of policies or the content of other documents.

The depositions were taken in the context of pre-suit discovery related to the suit eventually brought by Somerville Two. UniFirst had the opportunity to cross examine, but Liberty Mutual did not. Neither party has objected to the Court’s consideration of these depositions in this proceeding, and both parties have relied to varying extent on the testimony.

The parties refer to this incident as the “south release.”

The parties refer to these incidents as the “middle release.”

Liberty Mutual has moved to strike portions of both affidavits. The Court will address those motions infra.

UniFlrst has referred to this incident as the “north release.”

To corroborate this testimony, UniFirst offers the affidavit of consultant James Ash, to the effect that test results show heaviest contamination in the location that Driscoll and Wiley identified as the site of the spill they described.

UniFirst’s consultant states that UniFirst and its agents have “focused their defense efforts on persuading the DEP not to require a massive remedial effort,” including expensive measures such as excavation of and treatment of contaminated soils and groundwater.

The Somerville Two action was docketed as Middlesex Superior Court Civil Action No. 08-3075. On August 12, 2009, after prior notice to Liberty Mutual, UniFirst settled the action by agreeing to repurchase the site. The case was dismissed with prejudice.

The 2009 NOR has been administratively closed, based on a Response Action Outcome Statement submitted to DEP by UniFirst’s consultant on October 15, 2009.

 In his supplemental affidavit, Frank Wiley asserts that the trucks he used to transport product for UniFirst were all either owned or leased by UniFirst, and that those used in 1978 and 1979 were listed on the schedules of insured vehicles.

In Atlas Tack, as in Augat, the insured entered into a consent judgment. The Appeals Court characterized the case as “indistinguishable in material respects from those in Augat,” and determined that the facts similarly established prejudice without the need of any further showing. 48 Mass.App.Ct. at 384. See also Eastern Prods. Corp. v. Continental Cos. Co., 58 Mass.App.Ct. 16, 26 (2003).

Judge Neel applied a similar interpretation of Augat in Fitchburg Gas and Elect. Light Co. v. OneBeacon America Ins. Co., 27 Mass. L. Rptr. 556; 2010 WL 5490145 at *5-6 (Mass.Super. January 24, 2011).

Liberty Mutual does not rely on any failure to give prompt notice, which it acknowledges would require a showing of actual prejudice. See Darcy v. Hartford Ins. Co., 407 Mass. at 490; see also Employers Liab. Assur. Corp. v. Hoechst Celanese Corp., 43 Mass.App.Ct. 465, 472 (1997).

 Ng Bros. Constr., Inc. v. Cranney, 436 Mass. 638, 646-48 (2002), and Morrell v. Precise Eng'g, Inc., 36 Mass.App.Ct. 935, 937 (1994), do not support Liberty Mutual’s position on this point. In those cases, a witness attempted to contradict his own deposition testimony with a subsequent affidavit. That has not occurred here.

 The Court is not persuaded by Liberty Mutual’s contention that neither Wiley nor Driscoll is competent to testify as to instructions given to and practices of drivers generally, and as to UniFirst’s general practices in its operations at the site. Although weaknesses in their knowledge may be elicited at trial, the Court is satisfied that the affidavits establish sufficient general familiarity with the company’s practices to admit their testimony on these topics. The Court is similarly unpersuaded that paragraph 11 of the Wiley affidavit and paragraph 12 of the Driscoll affidavit should be stricken as irrelevant; even if these statements do not directly contradict the testimony on which Liberty Mutual relies, they are probative of whether discharges were routine, as Liberiy Mutual contends. Paragraph 11 of the Driscoll affidavit sets forth sufficient information to indicate that Driscoll had personal knowledge of the event he described; he asserts that the release “saturated my clothes.”

The affidavit states that Driscoll was operations manager for the facility. The Court can fairly infer that in that capacity he would have been familiar with the location and quantity of products on the site, and that he would have been notified of a spill promptly enough to observe its effects directly. On that basis, the Court declines to strike those portions of the paragraph that describe the event as a spill and refer to the amount and identity of the substance involved. As to the cause of the spill, however, as set forth in the third sentence of paragraph 19, nothing in the affidavit provides a basis to infer that Driscoll has any personal knowledge.

Liberty Mutual moves to strike the Ash affidavit insofar as it references events of which he could not have personal knowledge. The Court reads the affidavit as offered not to prove the occurrence of those events, but to show that test results in various locations are consistent with the statements of Driscoll and Wiley, and thereby tend to corroborate the evidence of a large spill in the north location. Understood in that manner, the affidavit is not hearsay.

Liberty Mutual points to evidence that the contamination is primarily from PCE, not TCE. Even if that were undisputed, which it does not appear to be on the evidence offered, the Court cannot, on that basis, determine as a matter of law that UniFirst will be unable to prove that a 1980 release of TCE caused an appreciable part of the damage.

A jury could also find that the smaller release described by Driscoll, at some unidentified time during his long-term employment, was sudden and accidental, and that it caused some part of the damage. The problem here is the absence of any evidence as to its timing.

Liberty Mutual asserts that the 1980 policy has been exhausted by other claims. UniFirst does not disagree, but responds that subsequent policies would cover damage for continuing harm resulting from releases in that year, including migration. The present record does not provide a basis to conclude otherwise as a matter of law at this stage.

Releases that were not sudden may also, nevertheless, have been accidental.

UniFirst has moved to strike what it characterizes as extrinsic evidence “to the extent Liberty Mutual relies upon it to escape its duty to defend.” Liberty Mutual has not sought to avoid responsibility for defense except insofar as, and after, it might obtain a judicial determination that it has no duty to indemnify UniFirst because the policies provide no coverage. For that purpose, extrinsic evidence is permissible. See generally Polarod Corp. v. Travelers Indem. Co., 414 Mass. 747, 754 (1993). The motion to strike will be denied.

To put the point in statutory terms, which Liberty Mutual does not actually do, declaratory judgment is inappropriate because there is no actual controversy between the parties on the issue. G.L.c. 231, §1.

As mentioned supra, in Watts Water Technologies, Inc. v. Fireman’s Fund Ins. Co., 22 Mass. L. Rptr. 659; 2007 WL 2083769 at *9, Judge Gants, then of this Court, elaborated on the application of the test established in those cases to facts similar to these.